MULTNOMAH COUNTY, *Plaintiff v.* DEPARTMENT OF REVENUE, *Defendant,* and PORTLAND CENTER DEVELOPMENT CO., *Intervenor.*

Charles S. Evans, Assistant Chief Civil Deputy Attorney, Multnomah County, represented plaintiff.

Alfred B. Thomas, Assistant Attorney General, Salem, represented defendant.

Harvey C. Barragar, Miller, Anderson, Nash, Yerke & Wiener, Portland, represented intervenor-taxpayer, Portland Center Development Company.

Decision for defendant and intervenor rendered May 3, 1971.

CARLISLE B. ROBERTS, Judge.

The Department of Revenue, in its Order No. VL 70-113, dated April 7, 1970, determined that certain property of the Portland Center Development Co., consisting of improved real property, should be assessed as of January 1, 1968, at a value of $9,500,000. Multnomah County, a political subdivision of the State of Oregon, has appealed from this order, praying that the assessed value of $12,543,640, placed upon the property by the county's Department of Assessment and Taxation, and affirmed by the Multnomah County Board of Equalization, should be reinstated. The taxpayer, owner of the property, the Portland Center Development Co., a partnership, intervened pursuant to ORS 306.545 (3) and acted in all respects as the defendant in the suit, the Department of Revenue making only a nominal appearance.

The sole question before the court is the true cash value of certain property situated in the City of Portland, County of Multnomah, described as follows: Tax Lot 7, Lot 2, Block A, South Auditorium Addition (designated by the owner as "A-2"); Tax Lot 8, Lot 2, Block A, South Auditorium Addition ("A-3"); Tax Lot 9, Lot 2, Block A, South Auditorium Addition ("A-4"); Tax Lot 10, Lot 2, Block A, South Auditorium Addition ("A-8"); Tax Lot 2, Lot 2, Block B, South Auditorium Addition ("B-5"); and Tax Lot 3, Lot 2, Block B, South Auditorium Addition ("B-6"). For conven-

ience, during the course of the trial, the owner's designation of the several parcels was used and they will be used in this opinion.

The subject property is located in the "South Auditorium Urban Renewal Area," located on both the north and south sides of Southwest Harrison Street and between Southwest Fourth and Southwest First Avenues in the City of Portland.

Parcel A-2 has a frontage of about 218 feet on the easterly side of Fourth Avenue, 214 feet in depth. The property is improved with a one-story office building built around a central mall or court. The building is poured concrete with metal windows running from ceiling to floor with parking level under the office level (and with additional parking provided in parcel A-3). On January 1, 1968, it was wholly occupied by Boise Cascade Company.

South of A-2 is parcel A-3, a blacktopped area enclosed by a four-foot high wall, with 114 feet of frontage on the northerly side of Northwest Harrison Street, 210 feet in depth. It is utilized as a parking facility by parcel A-2 and by the apartments in A-4.

Parcel A-4, to the east of A-3, fronts on southwest Harrison Street and abuts a pedestrian mall on the north, south and east and west. These malls are so decorated and landscaped as to appear part of the taxable area. The property is improved with a tower apartment of 25 floors, one storage level and two levels of parking. In addition, there is a garden-court complex of 12 units. This high-rise apartment is constructed of poured concrete, metal sash windows, balconies on all floors above the street floor, and all the floors are poured concrete. A central elevator

shaft, of poured concrete, contains elevators, janitor space, stairways and clothes chutes. Heat is provided by individual electric furnaces and air conditioning by individual electric units. On the top four floors are 16 penthouse apartments.

Parcel A-8 lies to the east of Parcel A-4 and contains a high-rise apartment with 22 floors, one storage level and two parking levels, with a construction similar to that described in parcel A-4.

Parcel B-5 is south of parcel A-4. It has 237 feet of frontage on the southerly side of Southwest Washington and a depth of 196 feet. The property is improved with a tower apartment of 24 floors, including three levels of penthouses, plus a storage level. Its features are essentially the same as the apartment building on A-4. There are 12 garden-court apartments on the site, identical to the garden-court apartments on parcel A-4. Because of difficulty in renting as residential apartments, they have been converted to offices. A swimming pool of approximately 20 by 40 feet is located on the site and is available to tenants in each of the three high-rise apartments.

Parcel B-6, located east of B-5 and south of A-8, has 201 feet of frontage on the westerly side of Southwest First and 146 feet of frontage on Southwest Harrison. It is improved with a building constructed of poured concrete with metal sash windows, built around an interior mall. Three sides of the mall are designed for commercial occupancy. Among other occupants is a restaurant and cocktail lounge called the "Jade West." There is an elevator and stair access to three parking levels containing approximately 27,000 square feet. Parking is available for commercial

visitors as well as for the occupants of the adjoining apartment houses.

The statute placed a duty upon the assessor to determine the "true cash value" of the subject properties as of January 1, 1968. ORS 308.215 (3). "True cash value" equals "market value." ORS 308.205. "Market value" is defined in the Department of Revenue's regulation, R308.205-(A), promulgated pursuant to ORS 308.205. As stated in the second part of the regulation, R308.205-(A):

> "Real property shall be valued through the market data approach, cost approach and income approach. Any one of the three approaches to value, or all of them, or a combination of approaches, may finally be used by the appraiser in making an estimate of market value, depending upon the circumstances."

All these approaches were used by the expert witnesses who testified before the court, but the total values offered in conclusion varied greatly; i.e., $7,559,200, $9,500,000, $9,693,640, $11,215,640, $12,543,640, and $14,400,000. Such disparities are not uncommon and illustrate the difficulties encountered in the art of appraising. See *Mid-Island Shopping Plaza, Inc. v. Podeyn*, 204 NYS2d 11 (S Ct 1960); affirmed 14 App Div2d 571, 218 NYS2d 249 (1961). As in that case, the appraisals of the subject property were made by experts of unquestioned integrity who rank high in their profession and who have many years of experience upon which to base their opinions. The court must carefully weigh the testimony and the methods of each appraiser and choose the strongest and best supported evidence, according to its judgment. See *Astoria Plywood Corp. v. Dept. of Rev.*, 258 Or 76, 481 P2d 58 (1971). The final estimate of

value, of course, cannot be an exact amount provable to an absolute certainty. *Oak Acres Mobile Homes Park v. Dept. of Rev.,* 4 OTR 340, 348 (1971).

The court viewed the property.

In 1966, Multnomah County appraised the property for the purpose of putting it on the assessment roll as of January 1, 1967. Thereafter, the Department of Revenue ruled that the property was exempt as a commercial facility in the process of construction. ORS 307.330. The property was then placed on the roll for the tax year 1968-1969, the county using its 1967 cost approach to determine the true cash value as of January 1, 1968. The following values were placed on the roll:

|  | Land | Improvements | Total |
|---|---|---|---|
| A-2 | $ 373,000 | $ 675,000 | $ 1,048,000 |
| A-3 | 125,720 | 8,200 | 133,920 |
| A-4 | 161,800 | 3,755,520 | 3,917,320 |
| A-8 | 124,600 | 3,101,000 | 3,225,600 |
| B-5 | 151,000 | 3,195,000 | 3,346,000 |
| B-6 | 172,800 | 700,000 | 872,800 |
|  | $ 1,108,920 | $11,434,720 | $12,543,640 |

"In the cost approach, the appraiser obtains a preliminary indication of value by first estimating the land's value, and adding his estimate of the depreciated reproduction cost of the building and other improvements. This approach is based on the assumption that the reproduction cost, new, normally sets the upper limit of value, provided that the improvement represents the highest and best use. * * *

"* * * * *

"* * * But physical deterioration and functional and economic obsolescence cannot be meas-

ured precisely as a physical object can be measured. Its measurement—or better, its estimate—depends largely on the experience and judgment of the appraiser. Therefore, a final estimate of value, based solely on reproduction cost less depreciation plus the value of the land, is subject to serious limitations; and the appraiser must go further, using the indications of value found by the market data and income approaches as checks." (American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* (5th ed, 1967) pp 61-63.)

Mr. Nick R. Matich, Appraisal Supervisor for Multnomah County, testified as to his choice of approaches to value. A fairly detailed study was made of the quantity and quality of materials used to construct the buildings. The State Tax Commission (now the Department of Revenue) had issued a cost-factor book to assessors which was used in making the estimate. Since the structures were new, no income experience was available and there had been no sales of such structures in Portland at the time. Since the developer had laid out approximately $13,500,000 as of the assessment date on the purchase of land and the construction of the improvements, the county was entitled to consider its assessed value at $12,543,640 as reasonable and conservative.

■ However, except where the appraiser has no other choice, the cost approach is generally applied only as a check on estimates of value by other approaches.

"An estimate obtained by the Cost Approach may not reflect entirely the prevailing economic or market conditions. The cost of an improvement cannot be recovered in the market if there is no need for the improvement, if the property is not put to its highest and best use, if the structure is an overimprovement or of poor design, or if rentals

are reduced due to economic conditions." (Friedman, *Encyclopedia of Real Estate Appraising* (Rev & Enlarged Ed, 1970) 67.)

The testimony was overwhelming that, as of January 1, 1968, all high-rise apartments in Portland (with the possible exception of two well-managed, "mature" properties) were in genuine financial difficulty. Testimony was adduced that at that time investors would probably have paid not to exceed 56 to 60 percent of the reproduction costs of such an enterprise. The knowledgeable sellers and buyers, contemplated by the definition of "market value" (Department of Revenue's regulation, R308.205-(A)) would have known this important fact. (The regulation is one generally in use throughout the United States and it assumes that both buyer and seller are familiar with the particular property and with the real estate market for the type of property involved, and that both are informed and intelligent persons.) On or about January 1, 1968, there was not the slightest chance that the property could have been sold for a sum approaching the reproduction cost.

The county's chief witness was Mr. Harold F. Meyer, M.A.I., S.R.E.A., who presented a very detailed appraisal report (Plaintiff's Exhibit 1) and testified both as to the sales approach and the income approach to value. He stated that he believed the property on January 1, 1968, was utilized at its highest and best use except for A-3, the parking lot used by A-2 and A-4. He testified that the lot could be improved by an office building which also made substantial provision for parking space for the building. He had engaged in the exercise of a cost approach to value as a check but did not utilize it for the reasons given

above. His main reliance was on the market data approach, utilizing sales, which gave him an assessed valuation of $11,215,640, rounded to $11,000,000.

■ The "market" or "market data" approach to value must be based upon recent sales of comparable properties in the market. As stated in *The Appraisal of Real Estate, supra,* at page 63:

> "The application of this approach produces an estimate of value of a property by comparing it with similar properties of the same type and class which have been sold recently or are currently offered for sale in the same or competing areas. The processes used to determine the degree of comparability between two properties involves judgment concerning their similarity with respect to many value factors such as location, construction, age and condition, layout, and equipment. The sale prices of properties judged to be most comparable tend to set the range in which the value of the subject property will fall. Further consideration of the comparative data will indicate to the appraiser a figure representing the value of the subject property; that is, the probable price at which it could be sold by a willing seller to a willing buyer as of the date of the appraisal."

It is generally the most satisfactory approach to value, when it can be used, and, if it can be used, our Supreme Court has indicated that it must be. *Portland Canning Co. v. Tax Com.,* 241 Or 109, 404 P2d 236 (1965). However, *sales of comparable properties* to establish the market are a basic requirement of this approach to value—and there were no such sales in 1966 and 1967, prior to the assessment date of January 1, 1968. Mr. Meyer, therefore, had recourse only to sales which occurred in 1969 or 1970, quite some time after the assessment date.

■ Little weight can be given to sales prices unless there is a sound basis for comparison. Age, size, location, improvements, type of construction, management and numerous other factors can make a difference which requires an adjustment. *Oak Acres Mobile Homes Park v. Dept. of Rev.*, *supra*. "The number of sales and degree of comparability needed for an accurate estimate of value cannot be specified. Appraisers usually feel that they do not have enough indicative comparable sales. The fewer the sales, the more carefully should they be investigated. * * *" Friedman, *Encyclopedia of Real Estate Appraising*, *supra*, p 25. Sales of comparable property made at about the same time as the assessment date are of primary significance, but sales of property subsequent to the assessment date involve the use of hindsight. Such evidence must be considered as of secondary importance.

The general legal doctrine is that hindsight appraisals are unacceptable. 1 Bonbright, *Valuation of Property* 84. This need not be the rule if the purpose of valuation is to determine damages to an owner, but where the purpose of the statute, as in the present case, is to determine the value on a specific date which would be achieved under the willing seller-willing buyer concept, the knowledge present on that date must be carefully determined.

Another difficulty in the use of the post-assessment date sales used by Mr. Meyer is that, while he made adjustments to bring the bare land values back to January 1, 1968, he made no such adjustments for the improvements, a factor of substantial importance.

But the court is also impressed by the fact that none of the "comparables" used by the plaintiff's witness were sufficiently similar to the subject property.

Although Mr. Meyer testified that the various units could be sold individually (in spite of interlocking uses of parking space, swimming pools, and the like), he himself lumped the three high-rise apartments for purposes of valuation, giving them values between $8,000,000 and $9,200,000, far in excess of the values attributable to the Hollywood Towne House, the Ione Plaza and The Fontaine. Because of the great disparity in value of the subject property as compared to the other units mentioned, it would seem reasonable to believe that many more buyers could be found for the latter than for the former.

The witness made use of the sales of two shopping centers on the theory that investors placed their capital in such property as quickly as they would place it in high-rise apartments. However, the lack of comparability of the two different categories is such that this evidence must be regarded as of secondary value when the market data approach is being considered.

We are then left with the income approach to value, a method based on factual data with respect to the income yield of the property. The method is also known as the "capitalization approach" because the income derived from the property, generally net annual income, is reduced to an indication of value by a mathematical process or computation known as "capitalization." Friedman, *op. cit. supra,* 36, states:

> "Income consists of recurrent periodic benefits or 'returns' arising through ownership and resulting from a capital investment in real estate. The major investment properties consist of multi-family apartment houses (see Chapter 10) and office buildings (see Chapter 15). The Income Approach is most frequently and most effectively used in estimating the value of such properties. * * *"

It is important that proper precautions have been taken in estimating net income and in selecting a proper rate of capitalization. *Feves v. Dept. of Rev.,* 4 OTR 302 (1971). There are variations in the formulas usable in this highly technical approach (see Friedman, *op. cit. supra,* ch 3.)

Mr. Meyer, as principal witness for the plaintiff, used the income approach as a check and developed a total assessed value for the subject properties of $9,693,640. Mr. Elmer Kolberg, M.A.I., A.R.A., a very experienced and expert appraiser called by the intervenor as its principal witness, testified that only the income approach could be used under the circumstances of this assessment date in Portland and, using such method, determined the assessed value as of January 1, 1968, to be $9,600,000. This figure was modified by consideration of "cash flow." With this modification he reached a value of $9,553,660, which was then rounded off to $9,500,000, which he testified to be the true cash value of the subject properties on the assessment date.

As stated in Friedman, *op. cit. supra,* 38:

"Capitalization is the discounting of future income into present value. In the capitalization process, the appraiser must take the following steps: (1) calculate the amount of net annual income that may reasonably be expected from the property, by deducting expenses from gross income; (2) estimate the length of time the net income will probably endure; (3) gather current local data bearing on the investment market, and relating to similar properties, (4) ascertain the capitalization or discount rate required to attract capital and representing a fair return on the investment, and (5) select a suitable technique for processing the information gathered into an estimate of value."

■ As has already been pointed out, the subject property was "immature." During its first year of rental activity (1967) the apartment occupancy had increased from 28.1 percent capacity to 61.8 percent in January of 1968. (Plaintiff's Exhibit 8.) In using the income approach, therefore, both Messrs. Meyer and Kolberg constructed the subject property's potential for future net income on the basis of experience in other high-rise elevator apartments in Portland. For this reason, Mr. Meyer preferred the sales approach over the income approach. This is not an ideal situation but an appraiser is often faced with situations which are less than ideal. In the absence of direct evidence of value that could be used in the market approach, this type of income approach gives the appraiser a stand on which to lean. This is the approach which would be used by a knowledgeable investor, after experimenting with the other approaches. The income or capitalization approach has been approved by the Oregon Supreme Court when the income attributable to the property in question can be segregated with reasonable certainty, as in the case of rental income. *Ore. Portland Cement Co. v. Tax Com.*, 230 Or 389, 369 P2d 765 (1962). And see *Schlesinger v. State Tax Commission*, 1 OTR 609 (1964).

Mr. Meyer and Mr. Kolberg used different options in certain aspects of their income tax approaches; e.g., Mr. Kolberg used a 50-year life on a straight-line basis, allowing two percent as an annual charge against income. Mr. Meyer criticized this method on the ground that such a method provides for a recapture based upon a declining income stream and he, instead, used a sinking fund method. Either one is acceptable but, as Mr. Kolberg observed, it is very difficult to prophesy the rate of return over a 50-year period.

The court finds the variances in the income approach used by Mr. Meyer and Mr. Kolberg as insignificant, considering that Mr. Meyer's value gained by this method was $9,693,640 and Mr. Kolberg's method was only $93,640 less. There is no need, therefore, to comment on the variations in detail but the court finds the evidence of the lower value more convincing, inasmuch as there appears to be a little less attention to detail in the Meyer's appraisal than in Kolberg's; e.g., Mr. Meyer treated each individual apartment as a unit, regardless of the mix in the apartment house of one-bedroom, two-bedroom or three-bedroom apartments. Since the comparables varied greatly in this respect, Mr. Kolberg's use of the room as a unit should result in greater accuracy. Mr. Meyer used $6 per square foot as the cost of commercial unit rentals but Mr. Kolberg's figure of $5.50 was based on better evidence. Mr. Meyer relied on the use of gross rental multipliers, which were sharply criticized by Mr. Kolberg. Friedman, *op. cit. supra*, at page 213, states:

> "Of even less consequence in the appraisal of an apartment building is the expedient known as the *gross rent multiplier* (see Chapter 3, page 44) representing the ratio of annual income to capital value. This is sometimes used by appraisers to arrive at a quick estimate of value. If the multiplier is not chosen wisely, the result can be highly deceptive."

The court does not decide that Mr. Meyer did not choose wisely. The method has been subject to criticism but it still has its defenders. See Ratcliff, *Don't Underrate the Gross Income Multiplier*, The Appraisal Journal 264 (April 1971). It does not seem to be the preferred method.

The court is further impressed by the fact that the

appraisal made by Mr. Kolberg was dated in April 1968, shortly after the assessment date, before occurrence of the sales used in the market data approach prepared by Mr. Meyer and is, therefore, the best evidence presented of the information available to a knowledgeable seller and a knowledgeable buyer without taint of hindsight.

Mr. Albert Bullier, Jr., an experienced appraiser and property manager, also used the income approach. As manager of the subject property, he had access to accurate income and expense data and relied upon them to achieve a total value of $7,559,200 as of January 1, 1968. The substantial difference between his conclusion and that of Messrs. Meyer and Kolberg in the use of the income approach results from Mr. Bullier's use of the actual income data of the subject properties instead of using a stabilized projected rental income. As noted above, under the circumstances peculiar to the subject property and to the assessment date, the court concludes that a buyer and seller meeting the requirements of the statutes, would have used rentals of other modern, high-rise apartments in the City of Portland, rather than the income of a property in its first year of rental income and only partially leased.

The order of the Department of Revenue, setting the value of the subject property as of January 1, 1968, at $9,500,000 is affirmed.