## MEDICAL BUILDING LAND COMPANY
## AND GOOD SAMARITAN MEDICAL BUILDING
### *v.*
## DEPARTMENT OF REVENUE

John L. Schwabe, Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, represented plaintiffs.

Alfred B. Thomas, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiffs rendered April 29, 1977.

CARLISLE B. ROBERTS, Judge.

Plaintiffs appealed from the defendant's Order No. VL 76-238, the sole issue being the true cash value, as of January 1, 1975, of an improvement to real property known as the Good Samaritan Medical Building, a part of Assessor's Account No. 45230-3230 in the

records of Multnomah County's Department of Assessment and Taxation. The property is located at 2222 N. W. Lovejoy Street in Portland, Oregon.

On appeal by the plaintiffs, the Board of Equalization for Multnomah County established the assessed value at $3,368,660, of which $168,660 was attributed to the land and $3,200,000 to the improvements. The defendant affirmed the decision of the board in its Order No. VL 76-238, dated April 2, 1976. In the present proceeding, counsel stipulated that the value of the land as of the assessment date was $210,000 (the parties' two expert appraisers, acting independently, having arrived at this figure). The plaintiffs contended that the value of the improvement did not exceed $2,415,000 while the defendant, in an amended answer, asserted a value for the building of $3,900,000.

The Good Samaritan Medical Building is a modern, reinforced concrete structure with brick veneer exterior. The structure has seven levels. The lower two are below grade and, along with the ground floor level, are designed for garage parking. The upper four floors are medical offices, except for space used for a pharmacy, cafeteria, and a branch bank on the lowest of the office floor levels. Two 7-stop elevators are located at the north end of the building. An enclosed bridge or corridor connects the subject building with the Good Samaritan Hospital on the opposite side of N. W. Lovejoy Street. The building has a gross area of 145,448 square feet of which 69,968 square feet are in the garage space and 75,480 square feet in the office area. Apart from the parking area, the net rentable area is approximately 62,895 square feet. As of January 1, 1975, the building was substantially completed except for the installation of tenants' fixtures in a number of the doctors' offices. (Defendant's expert appraiser testified that the building was 80 percent occupied as of January 1, 1975, and concluded that "[t]he total percentage of project completion on the

assessment date 1/1/75 was 99% and represents a total capital cost of approximately $4,020,000.")

Plaintiffs and defendant each presented one expert witness on the issue of the true cash value of the improvement as of the assessment date. Plaintiffs' witness, Mr. LeGall (S.R.E.A.), gained experience as a real estate salesman, mortgage loan officer and appraiser, and as an instructor in property appraisals, beginning in 1948, serving many substantial clients and qualifying as an expert witness in Oregon, Washington and federal courts. Defendant's witness, Mr. Gambee, now a commercial appraiser for Multnomah County, has gained experience over a period of 16 years, beginning in 1961. Each of these able, experienced men clearly qualified as an expert. As an ethical appraiser, each was required to give consideration to the three customary approaches to true cash value: the market data, income and cost approaches. Each complied with the requirement but they differed substantially in their respective conclusions as to the usefulness of each approach and the weight to be given to each with respect to the subject property.

Plaintiffs' witness made a detailed, complete and logical presentation. He was particularly experienced in property similar to the subject, having made appraisal and feasibility studies "from Spokane to San Francisco" on medical office buildings and having made particular appraisals of medical office buildings in the area of the subject property. He had surveyed the Portland area to identify the market.

He called attention to the removal of St. Vincent Hospital to Cedar Hills (a very large hospital originally located about three blocks from subject property), carrying with it many of the doctors who had maintained their offices in the area. With the completion of the Flanders Medical Building, five blocks south of the subject property, and the completion of the building herein considered, on or about January 1, 1975 (the assessment date), the available medical offices in the

northwest Portland area were increased by 50 percent. He testified that doctors are prone to locate near hospitals or in the neighborhood where their patients live and, consequently, the market for medical space is localized. The witness found that at the time of the assessment date, medical office property managers were giving added inducements to hold their tenants.

Having concluded that the erection of the Good Samaritan Medical Building constituted the highest and best use of the property, plaintiffs' witness turned to the various approaches to value and gave consideration to each of them. He gave careful consideration to the market approach, based upon direct sales of comparable properties. He analyzed the sales of five medical office buildings (as well as several business office buildings) but found that the sales data were not as comparable as is desirable and, after careful analysis, concluded that the data for the income and cost approaches were more reliable than those for the market approach (but he took note that his study had indicated a value range of $2,726,000 to $2,968,000, using this approach).

Plaintiffs' witness put his greatest trust in the income approach, although the subject property had no income history of its own. The income approach is that procedure in appraisal analysis which converts anticipated benefits to be derived from the ownership of property (dollar income or amenities) into a value estimate. The income approach is widely applied in appraising income-producing properties. Anticipated future income and reversions are discounted to a present worth figure through the capitalization process. (*See* American Institute of Real Estate Appraisers, The Society of Real Estate Appraisers, *Real Estate Appraisal Terminology* 112 (1975).) The plaintiffs' witness testified that the Physicians and Surgeons Hospital is located two blocks east of the Good Samaritan Hospital and there is a concentration of medical and medical-related facilities surrounding these two buildings. Other medical office concentrations are

being developed in the Cedar Hills area adjacent to the recently erected St. Vincent Hospital and still other medical communities are located adjacent to Emanuel, Providence and other hospitals in Portland. The subject building is in direct and immediate competition with the Lovejoy Medical Building (three blocks east and two blocks south of subject property) and the Physicians and Surgeons Medical Building (two blocks east and two blocks north of subject property). Plaintiffs' witness studied the rentals in depth in these areas and found that, as of the assessment date, oversupply had resulted in an increased vacancy ratio which worked to hold down rental rates. Since most medical office leases are written for five-year terms, the effect of the imbalance between supply and demand could be expected to affect this market for as long as five years. From this study, the witness was able to establish an expected rental of the subject building's office space of 62,895 square feet at $8.25 per square foot, to which was added the income from the parking contract (less an adjustment for tenant parking paid by management on behalf of 64 tenants). Operating expenses were based on the experience reported by local building owners and managers, together with data obtained in the process of appraising other competing medical and professional buildings, to arrive at a net operating income of $324,737, which was capitalized at 12.365 percent (including 2.865 percent for taxation), arriving at a value of $2,625,000. (The capitalization rate analysis of the witness of 9.5 percent was meticulously prepared.)

Plaintiffs' witness then gave a careful consideration to the cost approach to value. For his purposes, the witness was able to examine the subject property's building plans and specifications and to obtain the actual building costs and estimates of interest and loan fees. He examined the costs of other medical office buildings and made use of the Marshall Valuation Service. Using this approach, he found the reproduction cost of the building to be $3,760,520 (including

the bridge over Lovejoy Street). From this, he deducted amounts representing incurable functional depreciation (as viewed from the investor's standpoint) as follows: brick facing, $125,000; excess parking, $254,250; and the bridge, $12,800. The total of $392,050, deducted from the total cost of improvements, left a value of $3,578,470. The witness concluded that the cost of the building was on the high side compared with the potential return on the investment. Reasons given for this were that the building contract was bid, not negotiated; that the cost of the work was affected by two work stoppages; and that the Marshall Valuation Service corroborates the building cost as on the "high side." (On cross-examination, it was brought out that under the City of Portland's applicable ordinance, the amount of parking provided was precisely that which the city required. This fact, of course, does not derogate from the conclusion that the cost of the parking is in excess of the cost on which a reasonable return could be expected as of the assessment date, looking to the immediate future years.)

In reconciliation of the three approaches to value, the witness, orally and in his written appraisal, submitted his correlation and conclusion as follows:

"There are three 'Approaches to Value' that are standard in real estate appraisal. All three were employed in this appraisal. I have reviewed each approach and considered the indications of value found via their use. I have considered the quantity and quality of the data used in each approach.

"The indications of value found by the three approaches were:

| | |
|---|---|
| Income Approach | $2,625,000 |
| Market Approach | $2,726,000 to $2,968,000 |
| Cost Approach | $3,500,000 |

"There is an unusually wide spread between the value indication found by the income approach and the replacement cost of the building and land. Both estimates are supported by good market data. When this situation is found in a new property it is usually because the improvements do not suit the existing market.

"We had better data for the income and cost approaches than was available for the market approach. Nevertheless there is a reasonably good correlation between the results of the income and the market approaches to value.

"*Rent loss* is the standard measure of functional and economic obsolescence. I am convinced that the market rent ascribed to the subject property is all that the market will sustain. The subject is now better than 90% leased and the gross rental income is therefore fixed for the next five years. There is some probability that operating costs will continue to advance during that period.

"Prospective investors can be expected to consider the proposition that lease renewals will be at more economic rates. However, that is a speculative consideration.

"Having considered the reliability of the processes and the dependability of the data used in this appraisal, it is my opinion that Fair Market Value of Good Samaritan Medical building[1] as of January 1, 1975 is: * * * $2,625,000."

Defendant's witness testified orally and submitted a written appraisal which stated that "all available data indicated no sales of property comparable to the subject." The income approach was summarily dismissed with the statement:

"Usually, the income approach is accorded the greatest consideration in income producing properties. In the case of the subject, the income approach was considered to be invalid; since on January 1, 1975 this building was only 80% occupied, and income, expense and vacancy data was indeterminate." (Def Ex A, at 1.)

Thereupon, the witness relied wholly upon the cost approach, without a need to correlate indicated values. He obtained a total of building costs from the owners as follows: direct contractor costs, $3,312,932; total tenant improvements, $193,923; architect fees, $245,529; interest expenses, $230,349; loan fees, $33,928; lease fees, $44,334; total building costs,

---

[1]The testimony of the witness, as a whole, makes it clear that the words "and land" were omitted in the written appraisal report, Pl Ex 1, at 67.

$4,060,995. Determining that the total percentage of project completion on January 1, 1975, was 99 percent, he found a total capital cost of approximately $4,020,000. The total building cost as indicated by the Marshall Valuation Service was $3,959,589. Multiplying this sum by 99 percent (of "project completion"), he reached a sum of $3,919,993, which he rounded to $3,900,000, which he offered as the market value of the improvements as of January 1, 1975.

■ Defendant's counsel stated his objection to any testimony offered by the plaintiffs on any other basis than cost, making it clear that, in defendant's view, the cost approach was the only one to be used in the circumstances of this suit (available sales not being sufficiently comparable to make the market data approach reliable and because the subject property had no rental history of its own). The plaintiffs have relied strongly on the income approach. Defendant has rejected it, apparently on the authority of *Shields et al v. Dept. of Rev.,* 5 OTR 160 (1972), *aff'd,* 266 Or 461, 464-466, 513 P2d 784 (1973). While that case turned on the holding that the proper method of evaluation of buildings in a new shopping center was the cost approach rather than the income approach, that conclusion is not applicable to the present case. In *Shields,* the property was unique and the necessary income to justify the construction was dependent upon percentage leases as well as minimum rental guarantees. As was stated in that opinion:

" '* * * Since the Valley River Center was unique, the assessor could not obtain data of economic rentals through other local sources, as was possible in the case of *Multnomah County v. Dept. of Rev.,* 4 OTR 383 (1971), which involved a newly constructed high-rise apartment complex. * * *' " (*Shields v. Dept. of Rev.,* 266 Or at 465-466, 513 P2d at 787.)

■ In the present case, we do not have a unique situation but, instead, a well-defined market with strong competition and highly predictable income based upon defensible comparisons of rent, very simi-

lar to the facts in the *Multnomah County* case, *supra.* The income approach was more reliable than the cost approach in this case.[2]

The court finds that the preponderance of the evidence sustains the plaintiffs' position and that the true cash value of plaintiffs' property as of January 1, 1975, was $2,625,000, of which $210,000 is ascribable to the land and $2,415,000 to the improvements.

Defendant's Order No. VL 76-238 shall be set aside and held for naught and the Director of the Department of Assessment and Taxation, Multnomah County, shall amend the assessment and tax rolls in conformity with this decision. If taxes have been paid by the plaintiffs in excess of those required by the tax roll as amended, the excess, with statutory interest thereon, shall be refunded to the plaintiffs by the Board of County Commissioners of Multnomah County, Oregon, pursuant to ORS 311.806 and 311.812.

---

[2]Each approach to value has its inherent difficulties and dangers, hence the need to consider all of them. The cost approach provides an important starting point but its weaknesses were pointed out long ago by such outstanding students as Bonbright, Babcock and Ring. A recent and readable updating of the problems is found in 12 Assessors Journal 43 (March 1977), *The Cost Approach to Market Value: Theory and Evidence,* by John M. Clapp (Asst. Prof. of Real Estate and Urban Economics, U.C.L.A.).