Argued March 7, opinion affirmed July 12, 1978

# MEDICAL BUILDING LAND COMPANY et al, *Respondents,*

*v.*

# DEPARTMENT OF REVENUE, *Appellant.*

## (TC 1054, SC 25318)

582 P2d 416

[ 70 ]

Alfred B. Thomas, Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs were James A. Redden, Attorney General, Salem, and Theodore W. de Looze, Chief Tax Counsel, Salem.

John L. Schwabe, Portland, argued the cause for respondents. With him on the brief were Souther, Spaulding, Kinsey, Williamson & Schwabe, Robert G. Simpson, Robert D. Dayton, and Ridgway K. Foley, Jr., Portland.

Before Holman, Presiding Justice, Bryson and Lent, Justices, and Thornton, Justice Pro Tempore.

LENT, J.

Thornton, J., dissenting opinion.

## LENT, J.

Defendant-Department of Revenue (Department) appeals from a decree of the Tax Court reducing the assessed valuation of plaintiff's[1] property, a medical office building in Multnomah County, from $3,368,660 to $2,625,000. The sole issue is the determination of the true cash value of the subject property on the assessment date, January 1, 1975.

Our review is de novo on the record. ORS 305.445; ORS 19.125(3). Aside from conflicting opinion testimony on the ultimate issue, the facts of this case are uncontradicted. The building in question was constructed between 1972 and 1974 across the street from Good Samaritan Hospital in the city of Portland. It is a modern concrete structure of seven levels, with brick veneer exterior. The lower three levels are designed for garage parking (the first two being below ground level), and the upper four levels are designed for and occupied by medical offices, except space on the lowest office level used for a pharmacy, cafeteria and branch bank. Two elevators give access to each floor, and an enclosed bridge or "skywalk" connects the subject building with Good Samaritan Hospital.

The building has a gross floor area of approximately 150,000 square feet, of which approximately 70,000 square feet is garage space and approximately 80,000 is office space. Of the latter area, approximately 63,000 square feet is rentable. As of the assessment date, the building was 99% complete and 80% occupied. The Multnomah County Tax Assessor determined the true cash value of the subject property to be $3,368,660, of which $3,200,000 was attributed to the building and $168,660 to the land.

---

[1]Plaintiffs in this case are Medical Building Land Company and Good Samaritan Medical Building. The former, a wholly owned subsidiary of Good Samaritan Hospital, owns the subject property. The latter is a limited partnership of which Medical Building Land Company is the general partner. Good Samaritan Medical Building is the lessee of the subject property and as such is ultimately responsible for payment of the real property taxes in question.

Plaintiffs' appeal of this determination to the Department was denied, and plaintiffs filed suit in the Tax Court seeking to set aside this denial and to establish the true cash value of the subject property at $2,625,000. The Department answered, denying plaintiffs' allegations that its determination of the true cash value of the subject property was erroneous and alleging the true cash value of the subject property to be $4,110,000. The parties stipulated at trial that the true cash value of the land upon which the subject building was built was $210,000, which value is not at issue here. At trial before the Tax Court, each side put on a single witness, both being characterized by the Tax Court as "able, experienced men, clearly qualified as an expert." Each gave his opinion as to the true cash value of the subject property as of the assessment date. Each referred to the three standard approaches used in determining true cash value: the market data approach, the income approach, and the cost approach.

Plaintiffs' witness reviewed eight comparable sales and arrived at a market data estimate of a range of $2,726,000 to $2,968,000. His income approach, based on gross income and expense data from comparable medical office buildings, yielded an estimate of $2,625,000. His cost estimate was $3,500,000.

The Department's witness considered both the market data and income approaches but opined that insufficient data was available to support an estimate for either. Defendant's cost approach yielded an estimate of $4,110,000.

Plaintiffs' witness correlated[2] his three approaches by choosing the estimate based on the income approach as his final estimate of the true cash value of

---

[2] The process of correlation has been defined and explained as follows:

"The term 'correlation' implies a reciprocal relation and interdependence of functions—that is, an orderly connection of related elements. In the appraisal process, under the three-approach concept of value, correlation refers to the problem of bringing into focus the varying estimates of value arrived at by two or all of the three

the subject property on January 1, 1975. He concluded that the cost approach did not reflect true market conditions existing on the assessment date and acknowledged that the comparable sales used to support the market data approach were "not as comparable as [he] would have liked." The Department's witness, of necessity, relied exclusively on his cost approach estimate.

■ The Tax Court, having considered the conflicting opinion evidence, determined that the true cash value of the subject property on the assessment date was

approaches—the Market Approach, the Income Approach, and the Cost Approach. The appraiser makes a thorough study of all pertinent information gathered by him, and analyzes and weighs the strongest and most applicable data under each approach. The final conclusion as to value is based on the approach which is supported by the most convincing data, that is, the *primary* approach. The accuracy of this estimate is checked by the results reached under the other approaches used, the *secondary* approaches.
"* * * * *

"In every appraisal, a vast amount of data must be sifted, analyzed, and related to the subject property before a final estimate of value can be made. The purpose of correlation is to boil down this information and to choose the basic and fundamental facts that give the greatest support to an estimate arrived at by a particular approach.

"In applying any approach to value, the appraiser makes certain assumptions based on observation and sound reasoning. Each approach rests to some extent upon *opinion* evidence. The task of the appraiser in correlation is to seek out the approach that is supported by a preponderance of *factual* evidence. An approach that lacks support of a quantity of important factual data rests to a greater degree on opinion evidence. All available data for each approach must be processed, even if it may seem that an approach is relatively weak and less supportable than other approaches. The process of relating, weighing, and analyzing the data must go on within the development of each estimate of value.

"Value can never be calculated by adding up the several estimates arrived at in processing various approaches and taking an average of these estimates. Averages do not lead to a sound conclusion as to value; if an error was committed in estimating under any one of the approaches, it would merely be carried forward in a final estimate by average." Sarles, Correlation, Analysis, and Conclusion as to Value, in *Encyclopedia of Real Estate Appraising* (E. Friedman, Ed, 1968) 120-121. (hereinafter *Encyclopedia*) (emphasis in original)

$2,625,000, as plaintiffs proposed.[3] The Department's appeal involves two separate questions whose answers will resolve the ultimate issue of the true cash value of the subject property on the assessment date:

(1) What are the proper estimates yielded by each approach, and

(2) What is the proper correlation of the three approaches to yield the true cash value of the subject property?

The only point of conflict on the first issue involved the cost approach. The Department's witness arrived at his figure by applying a construction cost per square foot from the Marshall Valuation Service to the gross area of the subject building for a total of $3,959,589. That figure was then multiplied by the 99% completion rate as of January 1, 1975, to yield a total reproduction cost of $3,919,993 (rounded to $3,900,000). The efficacy of this figure was indicated by a cross-check to the actual cost of construction as reported by the plaintiffs—$4,020,000. Including land value of $210,000, the Department's witness' cost estimate was $4,110,000.

---

[3] Inherent in the exercise of our function is the question of the weight to be accorded to the findings of the Tax Court upon our de novo review. As with other such cases, factual findings based on conflicting evidence *where the issue of the credibility of witnesses is involved* are entitled to "great weight." *Jeddeloh v. Department of Revenue,* 282 Or 291, 294, 518 P2d 233 (1978); *Reynolds Metals v. Dept. of Rev.,* 258 Or 116, 119, 477 P2d 888, 258 Or 128, 481 P2d 352 (1971). In a case such as the present one, "credibility," in its commonly understood meaning, is not at issue. *Cf. Buschke v. Dyck,* 197 Or 144, 150, 251 P2d 873 (1953). However, deference in matters of credibility is based on two interrelated theories—one, the opportunity of the trial court to observe the demeanor of the witnesses and, two, the experience of the trial judge in evaluating and drawing conclusions from his observations. The latter aspect may be equally relevant to a case such as the present one, where an experienced tax judge evaluates and draws conclusions from evidence in a specialized field of inquiry where specialized knowledge and expertise is necessarily involved. In such a case, the tax court's findings may be entitled to some weight in our de novo consideration of the evidence in the record. Since there is no precedent for this deference, however, and the issue was not fully briefed in the present case, we have given no such weight to the tax court's findings in the present case.

■ Plaintiffs' witness' cost approach methodology was similar. The construction cost per square foot figure was based only in part on Marshall Valuation Service cost data and in part on actual cost experience from other buildings. The total cost estimate given by him for the subject building was $3,760,520. From this amount, he deducted $392,050 for "incurable functional depreciation"[4] for the construction cost of the brick veneer, excess parking space and the skywalk to Good Samaritan Hospital. Defendant objects to these deductions, and we agree. We find each of the items listed added an increment of value to the subject building reasonably commensurate with its cost.

■ Plaintiffs' witness explains the variance from actual cost by characterizing actual cost as "on the highside" due to a negotiated, rather than bid, contract and several work stoppages. We, therefore, must determine which estimate under the cost approach was more accurate. While the difference is not overwhelming considering the acknowledged imprecision of the appraiser's art,[5] we find that plaintiffs' estimate, based as it is on standardized data tempered by data from actual cost experience from other buildings, forms a better basis for fixing value.[6] We find, then, that the cost approach yields a value for the subject building of $3,760,520 (rounded to $3,800,000). To this

---

[4]Plaintiffs' witness explained this deduction in his Appraisal Report as follows:

"Our allowance for incurable functional depreciation reflects the cost of those items that exceed the standards of the market and for which the market is not willing to recognize a rental increment."

Functional depreciation includes losses in value brought about by (1) over-adequacy, (2) inadequacy, (3) inefficiency, and (4) out-of-date equipment. It is "incurable" if it cannot be accounted for by an estimate of "cost to cure." See Anderson, Appraisal of Residential Property in *Encyclopedia* 168, *supra* note 2.

[5] *See, e.g.,* Allison, A New Look at Appraisal Theory and Practice, in *Encyclopedia* 3-4, *supra* note 2.

[6] *See* MacRossie, Appraisal of Income Property-Office Buildings in *Encyclopedia* 373, *supra* note 2.

figure must be added $210,000 for the land, for a total of $4,010,000.

■ Defendant asserts that there was insufficient data to support any opinion as to the value of the subject building according to the market data or income approaches. Plaintiffs offered an opinion of value pursuant to each approach. We find that plaintiffs' estimates were supported by sufficient data, both in quality and quantity, to justify the making of an estimate.[7] Since defendant offered no counter-estimates under these two approaches, we accept those of the plaintiffs as offered. Thus, we find the estimates of value pursuant to each of the approaches as follows:

Cost approach—$4,010,000

Market data approach—$2,726,000 to $2,968,000

Income approach—$2,625,000

Now we embark on the somewhat mystical process appraisers refer to as "correlation."[8] From the three estimates above we must come up with a single figure for the true cash value of the subject property. Defendant argues that the cost figure alone reflects the true cash value, while plaintiffs argue (and the Tax Court agreed) that the income figure alone is the proper measure. Before we begin our search for true cash value, it is necessary to define exactly what it is we are looking for.

---

[7] Even if a particular approach is "relatively weak and less supportable than other approaches," the approach should be used unless no data is available at all. *See* Sarles, *supra* note 2.

The Code of Ethics of the American Institute of Real Estate Appraisers, § 10.213, states:

> "It is unethical for an appraiser to issue an appraisal report giving his opinion of value based solely upon the cost approach unless his reasons and justification are clearly and explicitly set forth in the appraisal report."

We cite this only to indicate the strong feeling within the profession that *all* available data be used to process each of the three approaches. *But see* Department of Revenue Regulation 150-308.205(A)(2) quoted in the text, *infra*.

[8] *See supra* note 2.

ORS 308.232 provides that "[a]ll real or personal property within each county shall be assessed at 100% of its true cash value." "True cash value," in turn, is defined by ORS 308.205[9] as follows:

> "True cash value of all property, real and personal, means market value as of the assessment date. True cash value in all cases shall be determined by methods and procedures in accordance with rules and regulations promulgated by the Department of Revenue. With respect to property which has no immediate market value, its true cash value shall be the amount of money that would justly compensate the owner for loss of the property."

Department of Revenue Regulation 150-308.205 (A)(1)(a) provides:

> "Market value as a basis for true cash value shall be taken to mean the highest price in terms of money which a property will bring if exposed for sale in the open market, allowing a period of time typical for the particular type of property involved and under conditions where both parties to the transaction are under no undue compulsion to sell or buy and are able, willing and reasonably well-informed."

In addition, paragraph two of this Regulation provides:

> "Real property shall be valued through the market data approach, cost approach and income approach. Any one of the three approaches to value, or all of them, or a combination of approaches, may finally be used by the appraiser in making an estimate of market value, depending upon the circumstances."

■ Thus, it is clear that it is market value that we are seeking. As to the approaches which are employed to ascertain this elusive value, much has been said about

---

[9]In 1977 the following sentence was added to ORS 308.205:

"With respect to property that is subject to governmental restriction as to use on the assessment date under applicable law or regulation, true cash value shall not be based upon sales that reflect for the property a market value that the property would have if the use of the property were not subject to the restriction unless adjustments in value are made reflecting the effect of the restrictions." 1977 Or Laws ch 423 § 2.

their relative efficacy.[10] Little, however, is to be gained from these abstract characterizations, since the efficacy of each approach depends, of necessity, on the facts and circumstances of each case, as recognized by the department regulation quoted above.

■ The Department's correlation in favor of the cost approach appeared to be based as much on the process of elimination as upon the merits of that approach. The Department felt no comparable sales existed to justify the market data approach and that, as a rule of law, without three to five years of actual historical net income experience of the subject building itself, no income approach could be used. Both contentions are erroneous. Plaintiffs acknowledge that the eight sales it uses as "comparables" were less than ideal because of differences in age, size, physical condition and location. Plaintiffs' use of their market data estimate, however, was limited to corroboration of the estimates yielded by the other approaches. We agree that the comparables were not such as to justify the market data estimate as true cash value of the subject property but that its use as corroboration of the value yielded by the income approach was correct.

■ The Department is also incorrect in asserting that the income approach may be used *only* where there is substantial historical data (income and expense) available from the subject property to support it. For this proposition, defendant relies on *Shields v. Department of Revenue,* 266 Or 461, 464-466, 513 P2d 784 (1973),

---

[10] It is said, for example, that ordinarily the market data approach, guided as it is by actual buyers and sellers of comparable property in the market, is the best guide to market value. Some would say it is the only valid approach. Allison, *supra* note 5 at 16. It is also said that the income approach is the most effective approach in determining the value of investment properties, Hollebaugh, Income Approach to Value, in *Encyclopedia* 36, *supra* note 2, and is the "chief approach" to value for large office buildings, MacRossie, *supra* note 6 at 369. Finally, it is generally agreed that the cost approach is the least reflective of market value and is used only as a check of the estimates obtained from the other approaches and usually as an upper limit of market value. Johnson, Cost Approach to Value, *Encyclopedia* 67, *supra* note 2. This is especially true for large office buildings. MacRossie, *supra* at 372.

where this court, in adopting language from the Tax Court's opinion, *Shields et al v. Department of Revenue*, 5 OTR 160, 164-166 (1972), stated that the income approach urged by the Department in that case was "grossly premature." The Tax Court in *Shields* expressly distinguished that case from *Multnomah County v. Department of Revenue*, 4 OTR 383 (1971), the case primarily relied on by plaintiffs here. *Shields* concerned a regional shopping center, characterized by the Tax Court as "unique," where economic rental data from comparables were not available, while *Multnomah County* concerned a newly constructed apartment complex, where comparables were available. The building in the present case is more similar to the apartment building in *Multnomah County*, where "comparables" in the form of other medical office buildings in the geographic area are available.

■ From these comparables, plaintiffs developed a fair market rental value of $8.25 per square foot of rental space per annum (62,895 square feet) on the assessment date, yielding $518,884 gross rent at 100% occupancy. At the projected 95% occupancy rate, plaintiffs would realize $492,839 as "effective gross rent." To this figure plaintiffs added income realized from the separate rental of parking spaces to yield a total of $511,899 effective gross income. Projected operating expenses, based again on a study of comparables, totaled $187,162 for a net operating income of $324,737. Plaintiffs then capitalized this net annual income at a 9.5% capitalization rate (increased by 2.865% to reflect the 1975-76 real estate tax rate of $28.65 per thousand) to arrive at their estimate for the true cash value under the income approach of $2,625,000. The Department challenges plaintiffs' use of this approach. We find it to be a valid approach worthy of this court's reliance.

■ The Department contends that it is the cost approach which deserves our exclusive attention. The dispute is not over the estimate yielded by this approach but over its reliability. Plaintiffs have

[ 79 ]

pointed out several cogent factors which explain the disparity between the cost estimate and what plaintiffs claim is the market value on the assessment date. The market value, according to plaintiffs, was lower than the costs figure, because (1) the market for medical office space is highly localized, with doctors preferring to locate close to the hospitals on whose staffs they serve, (2) the demand for medical office space in the area had fallen sharply with the relocation of St. Vincent's Hospital, formerly located approximately four blocks from the subject property and having 200 to 250 doctors on staff, and (3) the supply of medical office space expanded sharply with the completion of Flanders Medical Building, approximately five blocks from the subject property on or about the assessment date.[11] While these reasons do not completely invalidate the cost approach in this case, they are sufficient to relegate it to its recognized role of supplying an upward limit to the market value.[12]

Thus, plaintiffs' correlation of the three approaches which concluded that the income approach provided the most satisfactory estimate of true cash value of the subject property on the assessment date was amply justified. The decree of the Tax Court is affirmed.

**THORNTON, J.,** Pro Tempore, dissenting.

Contrary to the majority, I am of the firm opinion that the 'cost of construction approach' is the only proper method for fixing the true cash value of this newly constructed medical office building. After weighing the arguments of both sides, I am compelled

---

[11] Plaintiffs' analysis is supported by generally accepted appraisal theory. *See, e.g.,* Johnson, *supra* note 10 at 67:

"An estimate obtained by the Cost Approach may not reflect entirely the prevailing economic or market conditions. The cost of an improvement cannot be recovered in the market *if there is no need for the improvement,* if the property is not put to its highest and best use, if the structure is an overimprovement or of poor design, or *if rentals are reduced due to economic conditions.*" (emphasis added)

[12] *See* Johnson, *supra* note 10.

to agree with the Department of Revenue's argument that the 'cost of construction' is the only accurate and practical measure of the valuation at this time, given the fact that this building has just been constructed and was only partially occupied by tenants. Both the 'income approach' and the 'comparable sales approach' are plainly speculative here.

The so-called 'income approach,' which is the method urged by the building owners and accepted by the Oregon Tax Court, in my view is not proper under the facts presented here. I say this mainly because there is at present no earnings history of this building to go on. The 'earnings history' apparently relied upon by the Oregon Tax Court was subsequent to the assessment date, January 1, 1975, and therefore was probably not admissible evidence.

After the plaintiffs' building has an earnings history of at least a year, it would then be appropriate to reexamine the issue of valuation, and in doing so to consider the 'income approach,' but not until then, and certainly not to the exclusion of all other factors. *See, Shields v. Dept. of Rev.,* 266 Or 461, 513 P2d 784 (1973).

For the above reasons I respectfully dissent.