*[142]
 
 CARLISLE B. ROBERTS, Judge.
 

 Plaintiffs appealed from defendant’s Orders No. VL 77-667, dated November 29,1977, and No. VL 78-623, dated November 14, 1978, and the two cases were consolidated for purposes of trial. The sole issue is the true cash value of the plaintiffs’ personal residence for ad valorem tax purposes as of the January 1,1977, and January 1, 1978, assessment dates.
 

 In Order No. VL 77-667, the Department of Revenue sustained the county board of equalization’s finding that the true cash value for 1977-1978 was $115,500, with $86,700 thereof allocated to the residence and $28,800 allocated to the 1.7 acres of land. In Order No. VL 78-623, the department sustained the assessed value for 1978-1979 of $125,800, with $94,500 assigned to the residence and $31,300 to the land. Petitioners contended before the department, and pled in this court, that the true cash value of the subject property (land and residence) for both the 1977-1978 and 1978-1979 tax years was $80,000.
 

 The property is described in the Washington County Assessor’s records as Map 1S1 - 10AB, Tax Lot 1100. It is zoned "suburban residential” and is located about 400 feet east of Cedar Hills Boulevard, on S.W. Berkshire Street, in West Portland. It lies about one-half mile south of Sunset Highway and one-half mile west of Highway 2171 The Beaverton Mall shopping area is about one mile south. A junior high school and public tennis courts are located directly across the street from plaintiffs’ residence.
 

 The area contains large homes, ranging from 2,500 to 6,000 square feet, with lot sizes from one-half acre to three or more acres. Plaintiffs’ 1%-story house was built in 1957 and has five bedrooms, four and one-half baths, a living room, dining room, kitchen, family room, four fireplaces, a heat pump for heat and air conditioning, a half-finished basement, and a garage. Excluding the garage, its area is about 5,600 square
 
 *[143]
 
 feet, of which 4,860 square feet are finished. The 1.7-acre lot is level and contains large trees.
 

 Plaintiffs purchased the home and site in 1964 for $42,500, after it had been listed for sale for several months at $60,000. Eventually, they found the house to be too large for them. In 1973, in anticipation of selling the property, plaintiffs had two appraisals made; one, by the FHA, was $80,000; the other, by an independent fee appraiser, was $85,000. Plaintiffs then consulted with a realtor and, at his recommendation, listed the house and lot for sede at $97,500. The initial listing agreement between plaintiffs and the realtor was dated September 22, 1973, and extended through subsequent written agreements to November 12, 1974. The property was included in multiple listing. During this time, a large number of prospects were shown through the house, always on an "appointment only” basis. However, not one person accepted plaintiffs’ offer or countered with a lower price. According to plaintiffs, most of those who looked at the home indicated that the house was "just too big to take care of,” and required a large family to help keep the house up.
 

 At the termination of the last written listing agreement, plaintiffs asked the realtor to discontinue the "active” efforts to sell the home, and to remove the sign from the front of the property. Constantly keeping the house in condition to show to prospects had become too wearing. But plaintiffs testified they then agreed that the realtor would let plaintiffs know if and when the realtor found a qualified potential buyer interested in a large home, and they would talk with the potential purchaser to negotiate a price. The plaintiffs testified that this oral agreement with the realtor still exists and plaintiffs’ residence is still for sale. Pursuant to this agreement, plaintiffs have shown three or four couples through the home in the last two years, without success. Although their campaign has slackened, plaintiffs’ desire to sell was clearly proved at the trial.
 

 
 *[144]
 
 Plaintiffs suggested two reasons why their home did not, and has not, sold at the listed price or at any price. First, plaintiffs contend that the house is so large that it appeals only to a very restricted market; i.e., a large family with substantial income. Secondly, plaintiffs contend that the junior high school located just across the street severely affects the salability of the home. Noise from the playgrounds and tennis courts and from the cars traveling to the school and to the courts creates a nuisance. (Plaintiffs testified that persons using the tennis courts sometimes change oil and adjust their cars on plaintiffs’ property. Parties were occasionally held in the woods directly behind plaintiffs’ residence. Whether these incidents would be observed by viewers of the property is problematical.) Some persons who viewed the subject property indicated to plaintiffs that they did not wish to live directly across the street from a school.
 

 Defendant’s witness, an appraiser for Washington County since 1972, prepared and submitted written appraisal reports to support his opinion of the market value of the subject property on the two assessment dates. In his report for the 1977-1978 tax year, the witness arrived at an indicated value of $115,500 under the cost approach, and $120,000 based on the sales of "comparable” properties. His opinion of the market value for the subject property on January 1, 1977, was $115,000. For the 1978-1979 tax year, the witness arrived at indicated values of $128,100 under the cost approach and $139,200 under the market approach and concluded that the value of the property was $128,100. (The values sustained by the Department of Revenue for the 1977-1978 and 1978-1979 tax years were $115,500 and $125,800, respectively.)
 

 Defendant’s witness arrived at his indicated values under the cost approach in a fairly mechanical manner. With respect to the house, he relied upon data compiled in cost factor books published by the Department of Revenue. The witness simply computed the cost of replacing the structure, using the various cost
 
 *[145]
 
 factors, and depreciated that amount by 25 percent, having found the condition of the improvements to be 75 percent "good.”
 

 Under the market data approach, defendant’s witness relied upon five "comparable” sales for the first year, three for the second. Two of these were located quite near the subject property. The witness had to make numerous adjustments in these sales, seeking comparability with the subject property, taking into account variations in the time of sale, lot size, quality of construction, size of house, physical condition, number of baths, number of fireplaces, type of heat, and other improvements such as swimming pools. The number and amount of adjustments required greatly diminished the credibility of the testimony. Defendant’s witness believed that the market value of the subject property was favorably affected by the proximity of the property to schools, major highways, shopping, recreational facilities, hospitals, medical and dental services and bus lines. Except for the adjacent school, plaintiffs did not rebut this part of the testimony but they properly pointed out that the defendant’s alleged comparable sales still represented properties that had sold, whereas sale at such prices demonstrably could not be achieved as to plaintiffs’ property.
 

 The appraisal work of defendant’s expert witness, as reflected in his two appraisal reports, was presented in the competent fashion of the experienced appraiser. Ordinarily, it might well have met the preponderance-of-the-evidence rule of ORS 305.427. Merely "mechanical” work on the part of the appraiser in the cost approach is often sufficient. The dexterity of appraisers in developing "comparable” sales by the use of many adjustments (all highly subjective) frequently goes unchallenged.
 

 The fault of the appraiser in this case was that he was unable to find truly comparable sales and he apparently was not impressed by, or overlooked, the
 
 *[146]
 
 fact that the subject property had been on the market for years and never sold. This fault is shared by the board of equalization and by the department.
 

 When (as the court finds) the plaintiffs have exposed their property for sale in an open and active market for many years (1973 to the time of trial in March 1979) at a price suggested by an experienced realtor, with full use of multiple listing and after numerous contacts with potential buyers, and still have found neither acceptance nor even a counteroffer, questions must be asked. The first, most obvious, question is: Why didn’t the plaintiffs reduce their asking price? The answer to that is found in the testimony; the plaintiffs did instruct their agents, in mid-1975, to be selective in their future appointments for showings but to make clear to any persons showing interest that the asking price was negotiable. These steps, too, have failed.
 

 Although plaintiffs’ testimony does not establish true cash value for the tax years in question, it does indicate that the house suffers a type of obsolescence which was overlooked by the county’s appraiser. This was a house that could appeal only to a limited market; to persons in that market, the structure was "overbuilt.”
 
 Cf Fritz v. Dept. of Rev., 7
 
 OTR 375 (1978). The court has often noted that a conscientious and experienced appraiser’s viewpoint can become so channeled by procedure that he is unable to step outside the mental picture of value which he has created through the customary approaches and so fails to perceive that his estimate of value fails to jibe with reality.
 

 In determining the market value of the subject property, the relative efficacy of the three typical approaches to value, i.e., market data, income and cost, depends upon the facts and circumstances of each case.
 
 Medical Building Land Co. v. Dept. of Rev.,
 
 283 Or 69, 77-78, n10, 582 P2d 416, 421 (1978). But no one method or combination of methods is absolutely
 
 *[147]
 
 required; the right approach is a matter for the appraiser’s judgment in each case.
 
 Brooks Res. v. Dept. of Rev.,
 
 286 Or 499, 503-504, 595 P2d 1358, 1361 (1979).
 

 What is the appraiser to do under the facts of this case? It appears to the court that he might consider the application of that part of ORS 308.205 (which defines true cash value) which states:
 

 «* * * With respect to property which has no immediate market value, its true cash value shall be the amount of money that would justly compensate the owner for loss of the property. *
 
 *
 
 *”
 

 However, one of the well-established facts in this case is that the plaintiffs, for a number of years, on the advice of an experienced realtor, have offered to sell the subject property for $97,500. Generally speaking, offers are of little evidential value. Enough questions and problems are involved in determining true cash value through the usual cost, income and market data approaches, but these formalistic forms of groping are preferable to untried offers where there has been no eventual meeting of minds between the parties, and consequently tender of such evidence has been regularly rejected by the courts.
 
 Highway Com. v. Central Paving Co.,
 
 240 Or 71, 77, 399 P2d 1019, 1023 (1965);
 
 Highway Com. v. Morehouse Holding Co.,
 
 225 Or 62, 64-66, 357 P2d 266, 267-268 (1960);
 
 State of Oregon v. Cerruti et al.,
 
 188 Or 103, 115, 214 P2d 346, 351-352, 16 ALR2d 1105 (1950);
 
 Portland etc. Ry. Co. v. Ladd Estate Co.,
 
 79 Or 517, 155 P 1192 (1916); Annot, 7 ALR2d 781 (1949); Saliba,
 
 Real Estate Valuation in Court
 
 23-26 (IAAO 1972). This court regularly rejects testimony of offers whenever more substantial evidence of value is available.
 

 However, many authorities recognize that, in property tax valuation cases, bona fide listings establish the upper limit on the market value of the listed property. It is perceived that the seller’s desire to minimize his property value and property taxes is tempered by his desire to maximize the selling price of his property. A seller in an arm’s-length transaction
 
 *[148]
 
 will not list the property at an unreasonably low price simply in an attempt to minimize property taxes, as he runs the risk that the offer just might be accepted.
 
 See
 
 American Institute of Real Estate Appraisers,
 
 The Appraisal of Real Estate
 
 293-294 (7th ed 1978); International Association of Assessing Officers,
 
 Assessing and the Appraisal Process
 
 64 (5th ed 1974);
 
 Encyclopedia of Real Estate Appraising
 
 178 (Friedman ed, rev & enlarged ed 1968); May,
 
 The Valuation of Residential Real Estate
 
 168-169 (2d ed 1953).
 
 See also
 
 Ross,
 
 Selling Price and Market Value,
 
 in 1 Readings in Real Property Valuation Principles 245, 247 (Ballin-ger for Am Inst of Real Estate Appraisers, 1977). Perhaps the strongest statement supporting the use of listing prices as evidence of market value which appears in these texts is found in May,
 
 supra,
 
 at 168-169, as follows:
 

 "Listing prices furnish a sound basis for the use of the market approach. What buyers will do may result from impulse, whim, or caprice. But the seller, in fixing the listing price, usually acts with greater deliberation. The individual owner, for example, may be assumed to have made some investigation of the existing market levels before placing a price on his property. Thus some form of market analysis, however casual, will have preceded the action of listing the property for sale.
 

 «3: ;{; * * *
 

 "The listing, therefore, having followed an analysis of the market, will produce the probable value
 
 ceiling,
 
 although in most cases value levels will stabilize at some point below the asking price. * * *
 

 "There is, generally speaking, a normal spread between the asking and the bid prices assuming that both parties to the transaction are fully informed as to the optimum use to which the property may be put. Both the asking and the bid prices are hopeful figures. In the process of higgle-and-haggle, a meeting of minds develops somewhere between the two, and the transaction is consummated.
 
 But of this the appraiser may be certain: the asking price represents the ceiling of value;
 
 the bid price represents the floor. * * *
 
 In fact, listing prices are the only form of market data available during those
 
 
 *[149]
 

 phases of the market cycle when buyers are completely
 
 absent.” (Emphasis supplied.)
 

 In this unusual case, the court finds that the ceiling price applicable to the subject property for the two tax years in question was $97,500. However, the testimony does not produce a lower value, or "floor,” above which a willing buyer and a willing seller would eventually reach a true cash value for assessment purposes. A single
 
 sale
 
 could be acceptable evidence of market value.
 
 Sabin v. Dept. of Rev.,
 
 270 Or 422, 426, 528 P2d 69, 71 (1974);
 
 Equity Land Res. v. Dept. of Rev.,
 
 268 Or 410, 414-415, 521 P2d 324, 326 (1974);
 
 Kem v. Dept. of Rev.,
 
 267 Or 111, 114, 514 P2d 1335, 1337 (1973). However, we are unable to utilize that rule in this case. The subject property has not been sold. More testimony must be obtained to determine the true cash value or that value which is "the amount of money that would justly compensate the owner for loss of the property.”
 

 ORS 305.425(3) provides, in part:
 

 "(3) In the case of proceedings to set aside an order co-determination of the department, except as provided in subsection (1) of ORS 305.560, the issues of fact and law shall be restricted to those raised by the parties in the appeal to the department. If the court finds that other issues are important to a full determination of the controversy, it shall remand the whole matter to the department [Department of Revenue] for further determination and the issuance of a new order, unless the parties and the department stipulate to the determination of such other issues without remand to the department. * * *”
 

 The court will prepare an order to the defendant Department of Revenue, remanding the case to that agency to take the steps necessary to determine the amount of money that would justly compensate the plaintiffs in this suit for the loss of the subject property, taking note of the court’s finding that the upper limit of such value for the two years in question cannot exceed $97,500, and to issue a new order
 
 *[150]
 
 (unless the parties and the department stipulate to the determination of such value without the necessity of taking testimony, as provided by the statute).
 

 No costs to either party.