Argued and submitted July 1, 1986, decision of Oregon Tax Court modified
March 24, 1987

## OLLIS et al,
*Appellants,*

*v.*

## DEPARTMENT OF REVENUE,
*Respondent.*

## (OTC 2222; SC S32513)
734 P2d 860

Donald H. Coulter, Grants Pass, argued the cause and filed the brief for Appellants. With him on the brief was Myrick, Coulter, Seagraves, Myrick & Adams, Portland.

Marilyn J. Harbur, Assistant Attorney General, Salem, argued the cause and filed the brief for Respondent. With her

76

on the brief was Dave Frohnmayer, Attorney General and G. F. Bartz, Assistant Attorney General.

CAMPBELL, J.

## CAMPBELL, J.

The sole issue in this case is the determination as of the assessment date of January 1, 1983 of the true cash value[1] for taxation purposes of an 18.2 acre tract of land. The tract is located in Cave Junction and has been improved and used as a mobile home park.

The Josephine County Board of Equalization set the true cash value at $838,500. The taxpayers appealed to the Oregon Department of Revenue, which affirmed the Board of Equalization. The taxpayers then appealed to the Oregon Tax Court alleging in their complaint that the true cash value of the park as of January 1, 1983, was $478,745. The Department of Revenue's answer alleged that the value was $1,060,000. The Tax Court affirmed the Department's order affirming the Board of Equalization. Now the taxpayers under ORS 305.445 have appealed to this court. We try the "cause anew upon the record." ORS 19.125. We modify the Tax Court's decision.

When the taxpayers purchased the 18.2 acre tract it was undeveloped, logged-over land. The taxpayer Joe Ollis previously had been in the road construction business and had the necessary equipment and skills to develop a mobile home park. Work began on the project in 1972 and a total of 58 spaces were completed and occupied by tenants. In 1979 the taxpayers began the second phase of the construction. However, because of the economic recession and lack of demand, by January 1, 1983, the taxpayers had only completed an additional 26 spaces for a total of 84. As of that date an additional 33 spaces were only 57 percent finished—the underground utilities were in place and the road had been "roughed in."

The 18.2 acre tract runs east and west and is approximately 2,000 feet in length and approximately 400 feet in depth. The 84 developed spaces are in a herringbone pattern and each space fronts on an interior service road. The 33 partially completed spaces are located on approximately five acres in the southwest quarter of the property. The mobile

---

[1] ORS 308.232 provides: "All real or personal property within each county shall be valued and assessed at 100 percent of its true cash value."

ORS 308.205 provides in part: "True cash value of all property, real and personal, means the market value of the property as of the assessment date."

home park also includes a laundromat, a recreation building and a storage barn.

The park is called "Ol Jo Mobile Home Park" and is located within the city limits of Cave Junction. It is a prior existing use in an area zoned for single family residences. Photographs in the record confirm the witnesses' testimony that the park is of good quality. It has the appearance of being neat and clean. It contains a number of large evergreen trees. Cave Junction has a population of 1,080 and is located in the Illinois River Valley approximately 30 miles from Grants Pass. Most of the tenants of the park are retired people. Cave Junction has little industry and limited medical facilities. The latter is responsible for the mobile home park's high vacancy rate. On January 1, 1983, 19 of the 84 completed spaces were vacant.

The following Administrative Rules of the Oregon Department of Revenue are relevant to the determination of the true cash value of the 18.2 acre tract:

*"Real Property Valuation for Tax Purposes 150-308.205-(A)*

"1.   Definitions: a.  Market Value as a basis for true cash value shall be taken to mean the highest price in terms of money which a property will bring if exposed for sale in the open market, allowing a period of time typical for the particular type of property involved and under conditions where both parties to the transaction are under no undue compulsion to sell or buy and are able, willing and reasonably well informed. * * *.

"* * * * *. .

"2.   Methods and Procedures for Determining True Cash Value: Real property shall be valued through the market data approach, cost approach and income approach.

"The Cost Approach shall utilize either replacement or reproduction cost technique except [not applicable]. * * * The Income Approach may utilize property income or rental income technique. The Market Data Approach shall utilize actual market transactions.

"Any one or more of the three approaches to value may finally be used, except [not applicable]."[2]

---

[2] The above quoted portions of the current Administrative Rules of the Oregon Department of Revenue were in effect on January 1, 1983.

In the Tax Court three witnesses qualified as experts and each gave a different opinion of the true cash value of the Ol Jo Mobile Home Park as of January 1, 1983. In order to understand this case it is necessary to review the approaches used and the result reached by each expert.

The taxpayers' first expert witness was Duane Venekamp. He has been an independent fee appraiser since 1965. Prior to that he had been a staff appraiser for the Jackson County Assessor's Office. Under the market data approach Venekamp examined the sales of 12 mobile home parks in Jackson and Josephine counties. He analyzed the sales on a per space basis and found that the sales most comparable to the subject property were in a range from $7,413 to $8,785 per space. He concluded that the property in question had a fair market value of $7,800 per space. He then multiplied $7,800 by 84 completed spaces for a subtotal of $655,200. He completed his analysis under the market data approach by adding the 33 uncompleted spaces at a value of $2,000 per space ($66,000) for a grand total of $721,200.

Venekamp also examined the property in question under the income approach. He described this approach as "a method whereby the net income is capitalized to indicate the amount of investment required to produce the income." Venekamp determined that the estimated economic rent per space was $100 per month for the 84 completed spaces, or a gross annual income of $100,800. From the gross annual income he deducted actual vacancies of 23 percent or $23,184. He then added $400 for estimated income from the park's laundromat giving an "effective gross income" of $78,016. At this point Venekamp stated the average expenses of the typical mobile home park are 35 percent of the "effective gross income" and he deducted that amount ($27,305) giving an "effective net income" of $50,711. A capitalization rate of 8.1 percent was then applied to determine that capital of $626,062 would be necessary to produce income of $50,711.

Venekamp adopted the income approach and concluded that the true cash value of the property in question as of January 1, 1983 was the sum of $650,000. He concluded his appraisal report with the following comments:

"Correlating the data, the Market and Income Approaches indicated a fairly wide range of value for subject. Normally the

Income Approach and the possibility of increasing rents has the greatest influence on the purchase price of a mobile home park. In the case of subject property the vacancy factor is a great deterrent to prospective purchasers, most of whom do not want to invest in mobile home parks having vacancies in excess of 5%. Investors place greater reliance on the income capability of the property to be purchased, therefore greater weight is accorded the Income Approach in the final value determination."[3]

The taxpayers' second expert witness was George E. Trahern. He is an independent fee appraiser. He previously served as assessor for Josephine County for eight years. Trahern first examined the property in question under the cost approach. As a preliminary step he compared the sales of unimproved land in the City of Cave Junction and determined that the land-only value of the Ol Jo Mobile Home Park was $18,000 per acre or the sum of $324,000. He then used standard cost factors to establish a per space gross cost for the improvements on the 84 spaces. He determined that the per space gross cost was $3,917 which he reduced by 10 percent for physical depreciation and then further reduced the subtotal for "economic obsolescence—22.8 percent vacancy factor." This gave Trahern a net replacement cost of $2,722.21 per space or a total of $228,666 for the 84 spaces.

To reach a replacement cost for the 33 "roughed in" spaces, Trahern totaled the estimated costs of the sewer, water, electricity and telephone installations plus road grading for a total of $1,485 per uncompleted space. Multiplying $1,485 by 33 totals $49,005 for that portion of the cost. To obtain a final figure for the cost approach, Trahern added:

| | |
|---|---|
| Land value of 18 acres | $324,000 |
| Improvements 84 spaces | 228,666 |
| Improvements 33 spaces | 49,005 |
| | $601,671 |

In examining the property under the income approach, Trahern obtained the income and actual expenses of the Ol Jo Mobile Home Park for the calendar years of 1980, 1981 and 1982. Because of "several large variables from one

---

[3] The process of "correlation" is defined in *Medical Building Land Co. v. Dept. of Rev.*, 283 Or 69, 72, n 2, 582 P2d 416 (1978).

year to another," Trahern was forced "to determine the 'Typical Expected' income and expenses" instead of averaging the three years. Under that procedure he found the gross income to be $73,300 and the expenses, excluding property taxes, to be $20,265 for a net income of $53,035. The "net income" was further reduced by a "normal vacancy factor" of 5 percent to the sum of $50,384. Trahern then applied a capitalization rate of 9 percent plus a property tax rate of 1.414 percent to determine that $483,800 in capital would be necessary to return net income in the amount of $50,384. To that amount he added $77,000 for "other non-income improvements at cost" to reach a total value under the income approach of $560,800.[4]

Trahern considered and rejected the market data approach because there were no comparable sales in the Illinois Valley. It was his opinion that sales from other areas should not be used because the adjustments would be too large.

Trahern concluded his appraisal with the observation:

"The cost approach was strongly considered, as it reflects the current replacement cost, less depreciation. This approach was also rejected, however in favor of the income approach, which more accurately reflects the actual and expected income from the property, and thereby the return a prudent investor would expect."

He therefore found the true cash value of the property as of January 1, 1983, to be $560,800.

The Department of Revenue's expert witness was Maurice L. McWilliams. He is a real estate appraiser employed by the Josephine County Assessor's Office. Previously he had been assigned by his office to appraise all (approximately 32) of the mobile home parks in the county. McWilliams, in his replacement cost approach, assigned the following amounts to the Ol Jo Mobile Home Park:

| | |
|---|---|
| 65 rented spaces at $5,346 | $  347,490 |
| 19 vacant spaces at $2,920 | 55,480 |
| 33 unfinished spaces at $2,285 | 75,410 |

---

[4] Trahern testified before the Tax Court that the $77,000 represented the uncompleted spaces and the storage barn.

| | |
|---|---:|
| Recreation Building | 64,930 |
| Jacuzzi | 2,720 |
| Laundry | 17,080 |
| Storage Barn | 12,620 |
| 10 acres at $30,000 | 300,000 |
| 8 acres at $22,500 | 180,000 |
| Total | $1,055,730 |

McWilliams' appraisal was made upon the basis that there are 6.5 mobile home spaces per acre. The above-mentioned 10 acres represents the 65 rented spaces and the eight acres represents the 19 vacant spaces and the 33 unfinished spaces. The eight acres were reduced in value by 25 percent by McWilliams because it was his opinion that "the vacant 52 spaces (complete and incomplete) are * * * an over-improvement."

On the income approach McWilliams arrived at a gross annual income of $71,440 by using a monthly rental of $96 per unit for 65 spaces less five percent for vacancy and collection plus $300 from the laundry. From the gross income of $71,440 he subtracted $25,000[5] for expenses to obtain a net operating income of $46,440. By capitalizing that amount at seven percent he determined that $663,430 capital was necessary to earn an annual income of $46,440. To complete his "income approach" McWilliams added the following items:

| | |
|---|---:|
| Income approach of 65 spaces | $663,430 |
| 19 vacant spaces | 55,480 |
| 33 unfinished spaces | 75,410 |
| 8 acres at $22,500 | 180,000 |
| Total | $974,320 |

The last three items are taken directly from the replacement cost approach set out above.

In his market approach McWilliams used three recent sales from Rogue River, White City, and Eagle Point to which he considered the property to be comparable to the mobile home park in question. From these sales he extracted a gross rent multiplier and a sales price per space. He found the gross rent multiplier to be 8.5. He multiplied the gross annual

---

[5] McWilliams states in his appraisal that expenses are "typically 35%." Thirty five percent of $71,440 is $25,004. He has merely used a round figure in the appraisal.

rent from the 65 occupied spaces in the amount of $74,880 by 8.5 and obtained a result of $636,480. To that sum he again added his values from the replacement cost approach for 19 vacant spaces, 33 unfinished spaces, and the 8 acres for a total of $947,370. From the three comparable sales McWilliams found the sale price per space to be $12,870. He adjusted that amount downward 25 percent to $9,650 because the Ol Jo Mobile Home Park was unable to produce as much income per space as the comparable parks. By multiplying $9,650 by the 65 occupied spaces, he found the market value of those spaces to be $627,250. To that result he again added the replacement costs for 19 vacant spaces, 33 unfinished spaces, and the eight acres to a total of $938,140.

McWilliams concluded his appraisal by stating that the cost approach by itself is inadequate, but that the income approach tends to be a strong market indicator when the correct rate is used to capitalize. However, because the market approach is generally favored, he placed the greatest weight on it. He rounded off his final figures to $480,000 for the land and $470,000 for the improvements—making a total of $950,000 as the true cash value of the Ol Jo Mobile Home Park as of January 1, 1983.

No other witnesses testified in the Tax Court as to the value of the mobile home park.

By way of summary, the three expert witnesses relied upon the following approaches for their opinions as to true cash value:

| | |
|---|---|
| Venekamp—income approach | $650,000 |
| Trahern—income and replacement cost | 560,800 |
| McWilliams—market and replacement cost | 950,000 |

The Tax Court, in an unpublished opinion, affirmed the Department of Revenue's previous order by stating that the taxpayers had "failed to establish that the value of the property was less than $838,500" and that likewise, "defendant has failed to establish that the value is more than such amount."

On appeal to this court the taxpayers have set out three assignments of error. Because of the result we reach it is only necessary to consider one of the assignments:

"It was error for the tax court to hold that, when the income capitalization method of appraisal was being applied, the value derived from that formulation should be adjusted and swelled for the value or worth of nonincome producing features on the subject realty at appraisement date."

This assignment of error is aimed at the following portion of the Tax Court's decision which refers to Department of Revenue's appraiser:

"* * * Mr. McWilliams, while measuring the income from only the rented spaces (65), did not ignore the rest of the park property. He added the value of the remainder of the park as established by the cost approach to the value of the 65 spaces indicated by the income approach."

The crux of the taxpayers' argument is that when the income approach is used, the true cash value should be determined by income only and the value of non-income producing property should not be added. They demonstrate their argument by comparing the income approach appraisals of Venekamp and McWilliams.

Venekamp started by estimating the "gross economic rent" of 84 spaces. He then reduced the "gross economic rent" by subtracting the actual vacancy of 19 spaces or 23 percent. By capitalizing the net income Venekamp found a market value of $626,062. He ignored the 33 incomplete spaces because they produced no income.

McWilliams started by calculating the gross income for 65 spaces. He then subtracted five percent for vacancy and non-payment of rent. By capitalizing the net income McWilliams then reached an "indicated market value" of $663,430. McWilliams did not stop at this point. He added $55,480 for the 19 vacant spaces, $75,410 for the 33 unfinished spaces, and $180,000 for the eight acres on which those 52 spaces were located. Thus, what began as an "income approach" ended as an "income plus cost of replacement approach" with a total true cash value of $974,320.

We note that Oregon Department of Revenue rule 150-308.205(A)(2) provides in part that "real property shall be valued through the market data approach, cost approach and income approach," and that "[a]ny one or more of the three approaches to value may finally be used." Thus, it is clear that one or more of the three approaches may be combined to

determine the true cash value of the real property under consideration.[6]

Saying this does not mean that we approve of McWilliams' appraisal. There is no direct testimony in the record as to the location of the 65 occupied spaces, the 19 completed but vacant spaces and the 33 uncompleted spaces or their relationship to each other. However, a copy of an aerial photograph is attached to two of the appraisals from which it can be inferred that the 33 uncompleted spaces are located in the southwest quarter of the tract and that the 19 vacant spaces are intermingled with the 65 occupied spaces.

The 84 completed spaces, whether occupied or vacant, are each a part and parcel of an integrated business. They must be appraised together as a unit. A purchaser would be interested in the vacancy rate—not whether some individual space is occupied on a particular date. Vacancies are a fact of life in the mobile home park business—the same as in the hotel, motel or apartment rental business. Under the income approach, the current and not the potential income is measured. Vacancies are a factor in determining current income. A true result cannot be obtained under the income approach unless all spaces available for rent are considered.

Under the facts of this case the 33 uncompleted spaces can be appraised separate and apart from the 84 completed units. The income approach does not apply because they produce no income—they are only 57 percent complete. However, they have a potential value to a purchaser. As the Tax Court said: "surely they have some value." The 33 uncompleted spaces do not directly add or detract from the income approach appraisal for the 84 spaces. Although the income history of the completed spaces will affect the potential value of the uncompleted spaces, that fact does not prevent the latter from being appraised separately.

We hold that the Oregon law permits the 84 completed spaces to be appraised under the income approach and the 33 uncompleted spaces to be appraised under a different method and the two may be combined to reach the true cash value of the entire property.

---

[6] As a matter of fact, the taxpayers' other appraiser, Trahern, added $77,000 to his income approach appraisal for the 33 uncompleted spaces and the storage barn.

Now that we have made that determination we must proceed to find out *if* the income approach is the most accurate method of determining the value of the 84 completed spaces. We are also required to determine the correct approach as to the 33 uncompleted spaces.

The major value of the mobile home park is the 84 completed spaces that are available for rent. Though the laundry, recreation hall and storage barn are incidental to the spaces for rent, they are a part of the overall scheme to produce income for the owners and should be considered under that approach. Only Trahern and McWilliams used the cost approach and both rejected it as to the 84 completed spaces.[7] We agree. All three experts appraised the property under the market approach, but only McWilliams found it to be the most accurate way to determine the true cash value.

Both Venekamp and Trahern rejected the market approach because available comparable sales required too much adjustment to be accurate. We agree. Illinois Valley is an area which is separate and distinct from the rest of the county. A low range of mountains separates it from the Grants Pass area. Cave Junction is 30 miles and 45 minutes from specialized medical facilities in Grants Pass. The only major industry in the Illinois Valley is a sawmill approximately five miles from Cave Junction. The economy of the area is supported by some agriculture and tourist trade. There have been no sales of mobile home parks in the Illinois Valley and therefore comparable sales must come from Grants Pass and other adjacent areas. The vacancy rate in the local mobile home parks has been high — 23 percent for the subject property. The vacancy rates in Grants Pass and other areas have been low. A factor that contributes to the high vacancy rate in the Cave Junction mobile home parks is that its zoning regulations permit single mobile homes on residential lots while other urban areas prohibit that practice.

---

[7] Venekamp's appraisal contains the following statement:

"The Cost Approach was not used as one of the primary elements of costs in the length of time from completion of construction to filling or 100% occupancy. The generally accepted or observed time for mobile home parks of any size to fill can be a minimum period of three years to a maximum of five years. Subject property's expansion occurred five years ago and it had not been filled to date. This is an important contributing factor to the appraiser's conclusions that subject is an over-improvement for the Cave Junction area."

■ After we have rejected the cost replacement and market approaches as to the 84 available spaces we have only one choice—the income approach. This is not a choice of three evils. We hold that under the particular facts of this case, the income approach is clearly the most accurate way to determine the true cash value of the completed spaces together with the land on which they are located and the buildings incidental thereto. Without attempting to compare the three appraisals, we find that Venekamp's is the most accurate. Therefore, the true cash value of the 84 completed spaces and the property appurtenant thereto is $626,062.

That leaves for our consideration the 33 incomplete spaces. Venekamp did not consider these spaces in his income approach, but assigned them a value of $2,000 per space in his market approach. He reached this figure because as a part of a sale in Eagle Point 12 "expansion spaces with sewer" sold for $24,000. Trahern in his replacement cost approach assigned a sum of $1,485 to the improvements on each of the incomplete spaces. He broke this down into road grading $200, sewer $430, water $355, and electric/telephone $500. He also *added* land value at $18,000 per acre or $2,769 per space. Therefore, Trahern's replacement cost per space totals $4,254. In his market data approach Trahern added the sum of $77,700 for "other improvements" which he later testified included the 33 unfinished spaces and the storage barn.

In each of McWilliams' three different approaches to true cash value, he appraised the 33 unfinished spaces at $2,285 each for a total of $75,410. He also appraised the land upon which the 33 spaces were located at $22,500 per acre, which computes out to $3,461 per space.

■ We find that the replacement cost for the improvements on each of the uncompleted spaces set by Trahern in the amount of $1,485 is realistic. We find that the value of the land underlying each of the spaces as set by Trahern and McWilliams is not realistic. Prospective purchasers who desired to purchase the Ol Jo Mobile Home Park as of January 1, 1983, would be very reluctant to tie their capital up in 33 unfinished spaces when they would also be buying 19 vacant completed spaces or a vacancy rate of 23 percent. In the foreseeable future they would receive no return on that portion of their capital while being required to pay property taxes and

experiencing depreciation on the improvements. Purchasers would be gambling that at some time in the future, demand would allow the completion of the 33 spaces so that they could be rented at a profit. If construction expenses do not increase it would cost between $1,100 and $1,200 to finish each space. The only other alternative would be to rip out the underground utilities and sell the five acres for single family residences. There is no evidence in the record as to financial implications of that alternative.

We try this case *de novo*. We find that the true cash value of each uncompleted space is $1,485 for the improvements and $1,000 for the 1/6.5ths of an acre underlying it. $2,485 multiplied by 33 equals $82,005.

By way of summary we find that the true cash value of the 84 completed spaces if $626,062. The true cash value of the 33 uncompleted spaces is $82,005. The total true cash value of the entire property is $708,067.

The decision of the Tax Court is modified.