IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

UMPQUA BANK and ) 
WILLAMALANE PARKS & RECREATION ) 
DISTRICT, ) 
 ) 
        Plaintiffs, )   TC-MD 110594N
 ) 
   v. ) 
 ) 
LANE COUNTY ASSESSOR, ) 
 ) 
       Defendant. )   **DECISION**

Plaintiffs appeal the real market value of property identified as Account 1699535

(subject property) for the 2010-11 tax year. A telephone trial was held on March 22, 2012.

Christopher K. Robinson (Robinson), Attorney at Law, appeared on behalf of Plaintiffs. Bob

Dant (Dant), real estate broker and representative of Plaintiff Umpqua Bank (Umpqua Bank) in

the sale of the subject property, testified on behalf of Plaintiffs. Dwight Purdy (Purdy), Oregon

licensed attorney and general counsel to Plaintiff Willamalane Parks & Recreation District

(Willamalane), also testified on behalf of Plaintiffs. Roxanne Gillespie (Gillespie), MAI,

Certified General Appraiser, Lane County Department of Assessment and Taxation, appeared

and testified on behalf of Defendant.

Plaintiffs offered Exhibits 1 through 6, 8, 9, and 11, and Rebuttal Exhibits 13 through 16.

Plaintiffs' Exhibits 5 and 6 and Rebuttal Exhibits 13 through 16 were admitted without

objection. Defendant objected to Plaintiffs' Exhibits 1 through 4, 8, 9, and 11 because each

exhibit pertains to the listing and sale of the subject property after the January 1, 2010,

assessment date. At trial, Gillespie cited several cases, including *EJK Investments LLC v. Lane*

*County Assessor*, TC-MD No 040558C at 9 (Jun 20, 2005), in support of Defendant's contention

that post-assessment date sales are not relevant. Robinson responded that the cases cited by Defendant are distinguishable because they involved the use of post-assessment date sales in a sales comparison approach, not the sale of the subject property. Dant testified that market conditions in December 2010 were not materially different than those on January 1, 2010. The court admitted Plaintiffs' Exhibits 1 through 4, 8, 9, and 11 over Defendant's objection, stating that the objection would be considered when weighing the exhibits.[1]

Defendant offered Exhibits 1, 2, and 3 and Rebuttal Exhibit A. Defendant's Rebuttal Exhibit A was admitted without objection. Plaintiffs objected to Defendant's Exhibits 1, 2, and 3.[2] At trial, Robinson argued that Gillespie's appraisal report is based on "mass appraisal techniques" and Gillespie's land sales and improved sales do not have the same highest and best use as the subject property. The court admitted Defendant's Exhibits 1, 2, and 3 over Plaintiffs' objection; the issues raised by Plaintiffs will be considered when weighing the exhibits.

## I. STATEMENT OF FACTS

The subject property is a 72,607 square-foot regional sports center located in Springfield, Oregon.[3] (Ptfs' Ex 8 at 1.) The subject property site is 9.75 acres, or 424,710 square-feet. (Def's Ex 1 at 9.) Dant testified that the subject property lacks visibility and access. He testified that Springfield is an inferior market to Eugene, but conceded on cross-examination that he is aware of new subdivisions and multi-family housing near the subject property.

/ / /

---

[1] *See, e.g., Sabin v. Dept. of Rev.*, 270 Or 422, 427, 528 P2d 69 (1974) (holding that "[t]he interval between the transaction in the subject property sought to be introduced and the assessment date may be so great that it can be said as a matter of law that there was a change in conditions. However, where this determination cannot be made as a matter of law, reference must be made to the underlying conditions affecting value before such evidence can be rejected.").

[2] Defendant's Exhibits 1, 2, and 3 are Gillespie's appraisal report, a newspaper article, and the subject property deed in lieu of foreclosure, respectively.

[3] Gillespie determined the subject property to be 94,836 square-feet. (Def's Ex 1 at 9.)

Purdy testified that the project to develop the subject property was started in 2002 as a land gift, with the permission of the City of Springfield. (*See* Ptfs' Ex 5.) He testified that the subject property was located in the highest crime area of Springfield and the city's hope was that the subject property would improve the image of the area and reduce crime. Purdy testified that a lumber facility is located west of the subject property and the subject property site is situated on a former log pond. He testified that, although there is a residential neighborhood east of the subject property, the subject property's immediate surroundings still experience economic depression and the highest crime rates in the area; the median household income within one mile of the subject property is $18,000.[4] Purdy testified that, in order to operate a successful athletic facility, it is necessary to locate the facility in an area with a higher percentage of affluent households; specifically, households with incomes in excess of $75,000 or $100,000.

A.    *Zoning and deed restrictions*

Dant testified that the subject property is zoned "Public Lands" (PL), which is essentially "open space" or "park" zoning. Purdy testified that the subject property deed, recorded in September 2002, includes three restrictions: First, the subject property zoning may not be changed "from public lands and open space designation"; second, the subject property must be "used solely as [a] sports and recreational facilit[y]"; and, third, the subject property would "revert to Willamalane"[5] if a number of building milestones were not achieved. (*See* Ptfs' Ex 5.) Purdy testified that, as of January 1, 2010, the subject property facility was not complete as

---

[4] Purdy testified that he obtained the demographic information for the subject property area from an appraisal completed for Umpqua Bank. Defendant objected to testimony by Plaintiffs' witnesses regarding the appraisal because that appraisal report was not exchanged as an exhibit. Plaintiffs responded that they are not relying on the appraisal as support for their requested reduction in real market value. In addition, Purdy testified that he did not rely on any of the "assumptions" or "conclusions" of Plaintiffs' appraisal because he did not agree with them, but he did rely on the "data" provided.

[5] The 2002 Bargain and Sale Deed provided to the court does not include any additional clarification whether the references to "Willamalane" are, in fact, to Plaintiff Willamalane, the 2010 buyer of the subject property. Presumably, "Willamalane" refers to Plaintiff Willamalane.

required under restriction three of the 2002 deed and Willamalane had a right of reversion that it could have exercised; that constitutes a "cloud" on the title. (Id.) Dant testified that the subject property could "easily" have served as a "storage" facility but for zoning and deed restrictions.

B.     *Sale of the subject property by Umpqua Bank*

Dant testified that the subject property was in foreclosure as of January 1, 2010. The subject property was transferred to Umpqua Bank by a deed in lieu of foreclosure that was recorded June 28, 2010. (Def's Ex 3.) Umpqua Bank sold the subject property to Willamalane for $1.5 million in December 2010. (Ptfs' Exs 2, 4.) That sale included about $367,000 attributable to personal property. (Ptfs' Exs 1 at 9, 2, 6.)

Dant testified that he represented Umpqua Bank in the sale of numerous foreclosed properties, including the subject property. He testified that, as of January 1, 2010, the subject property was losing money so it would be difficult for potential buyers to obtain financing; thus, marketing of the subject property was effectively limited to cash buyers. Dant testified that the subject property was initially listed in July 2010 at $3.6 million based on the appraisal completed for Umpqua Bank. (*See* Ptfs' Ex 8.) He testified that three parties initially expressed interest in the subject property and Umpqua Bank focused on those potential buyers. Dant testified that the subject property sale closed on December 17, 2010, for $1.5 million or $20.67 per square foot. (*See* Ptfs' Ex 3.) He testified that the market conditions in December 2010 were not materially different than on January 1, 2010. Dant and Purdy both testified that the five to six month marketing time seemed to be reasonable.

Purdy testified that negotiations over the purchase of the subject property by Willamalane occurred over a period of several months. He testified that Willamalane is a "special purpose park district," and a "political subdivision of the State of Oregon." He testified that Willamalane

is tax exempt. Purdy testified that Willamalane's other activities include putting on concerts and community activities, as well as operating teen centers, roller derbies, and miniature golf; it owns many acres of park land and provides competent management.

Dant testified that he received a letter from Purdy supporting a $1.5 million value for the subject property. (*See* Ptfs' Ex 11 at 2.) He testified that he read the letter and agreed with Purdy's value conclusion. Dant testified that, in his letter, Purdy estimated that necessary improvements to the subject property following purchase would cost $400,000 to $600,000. (*See id*.) Purdy testified that, at the time of Willamalane's purchase, the subject property needed roof repairs and new courts. He testified that, as of the date of trial, Willamalane had spent $885,000 on repairs and improvements to the subject property including $30,000 to $40,000 on the roofs, which still leak. Dant testified that Umpqua Bank made a counter-offer of $3 million including financing to Willamalane, but Willamalane rejected that counter offer. (*See* Ptfs' Ex 12 at 1.) Purdy testified that Willamalane had access to a pool of funds at a very low interest rate that it used for the purchase of the subject property; thus, Umpqua Bank's counter-offer including financing was not appealing to Willamalane.[6]

Purdy testified that he completed extensive "due diligence" concerning the subject property purchase and found the three main issues affecting the subject property were the prohibition on changing the subject property zoning, the additional deed restrictions, and the location of the subject property. Purdy testified that Willamalane determined a value of $1.5 million for the subject property and was not willing to go above that value.

Gillespie noted the 180-day term of the listing agreement between Dant and Umpqua Bank and questioned whether that indicated that the sale of the subject property was subject to

_____

[6] Purdy testified that Willamalane was able to obtain financing without using the subject property as collateral, which was the most advantageous aspect of its financing.

non-typical market conditions.  (*See* Ptfs' Ex 8 at 2.)  Dant testified in response that a 120 to 180-day marketing period is standard for his agreements with Umpqua Bank.  Gillespie characterized the sale of the subject property to Willamalane as both a "feel-good" sale and as a "liquidation" sale.

Gillespie provided a November 11, 2010, article from the Eugene Register-Guard newspaper, which states that "Willamalane estimates that the 72,600-square-foot sports center on 32nd Street and its surrounding 9.75 acres is worth about $8 million."  (Def's Ex 2 at 1.)  Gillespie also provided the deed in lieu of foreclosure, recorded June 28, 2010, which states the "principal plus accrued and accruing interest, late charges, expenses" as $5,061,640.35.   (Def's Ex 3 at 1-2; *see also* Def's Ex 2 at 1 (stating "[t]he deed had secured $5.06 million in principal, interest late charges and other fees").

C.      *Defendant's appraisal*

Gillespie recognized the deed restrictions limiting the use of the subject property and concluded that the highest and best use as of January 1, 2010, was "the existing use" of the subject property as improved.  (Def's Ex 1 at 16-17.)  Gillespie valued the subject property under both the cost approach and sales comparison approach.  (*Id.* at 9.)  She gave the most weight to the sales comparison approach and concluded a value of $5,500,000 for the subject property as of January 1, 2010.  (*Id.* at 24.)

1.      *Cost approach*

Gillespie testified that, to determine the land value of the subject property, she considered sales of land zoned for both commercial and multi-family uses.  (*See* Def's Ex 1 at 20.)  She testified that she could not find any sales of PL zoned land and considered commercial and multi-family to be the most comparable zones.  All but one of the land sales selected by Gillespie

are smaller than the subject property, ranging in "usable lot size" from 7,044 to 204,296 square-feet; the one larger land sale was 1,007,978 square-feet. (*Id.*) Gillespie's land sales ranged from $6.70 to $9.51 per usable square-foot. (*Id.*) Taking into account the deed restrictions and size of the subject property land, Gillespie concluded a land value of $6.00 per square-foot, or $2,548,000, rounded, for the subject property land. (*Id.*) Citing *The Appraisal of Real Estate*, 299-300 (13th ed), Plaintiffs criticized Gillespie's land sale analysis, noting that none of Gillespie's land sales had the same highest and best use as the subject property. Gillespie disagreed with Plaintiffs' assertions that none of her land sales had the same highest and best use as the subject property.

Gillespie testified that she used Marshall and Swift to determine the value of the subject property improvements. (*See* Def's Ex 1 at 21.) She determined a total improvement cost new of $8,084,565, to which she added five percent for the "developer's overhead & profit" for a "total construction cost" new of $8,488,793. (*Id.*) Gillespie determined depreciation of $2,122,198 for a "total cost less depreciation" of $6,366,595. (*Id.*) Adding her land value, she concluded a value under the cost approach of $8,914,595 for the subject property. (*Id.*)

Both Dant and Purdy testified that the cost approach should be given very little weight and that the income approach is the approach typically relied upon.

2.      *Sales comparison approach*

Based on four sales, which occurred between July 2004 and September 2008, and two listings, current as of the report date, Gillespie determined a value range of $54.17 to $89.74 per square-foot, after removing the high and low indicators. (Def's Ex 1 at 22-23.) The comparable sales and listings are all sports or athletic facilities. (*Id.*) Only two of the properties are located in Lane County, both of which are in Eugene: sale 4, which sold for $41.19 per square-foot in

July 2004, and listing 5, with an asking price of $62.53 per square-foot. (*Id.* at 22.) Gillespie's comparable sales are all smaller than the subject property, ranging in size from 18,000 to 75,000 square-feet. (*Id.*) The remaining listing and sales are located in Hillsboro, Portland, and Vancouver, Washington. (*Id.*) Gillespie's comparable sales and listings are all older than the subject property, with construction dates ranging from 1977 to 2002. (*Id.*) She testified that most sales were owner-managed properties. Gillespie determined a value of $55.00 per square-foot for the subject property, or $5,216,000, rounded. (*Id.* at 23.)

Plaintiffs questioned whether Gillespie's comparable sales have the same highest and best use as the subject property and specifically asked about the zoning of each sale and listing. Gillespie testified that sales 1 and 3 are zoned light industrial; sale 4 is zoned community commercial; and she was unsure of the zoning of sale 2 or listings 5 and 6. (*See also* Ptfs' Rebuttal Ex 16 (regarding sale 4).) Plaintiffs provided records from Washington County and Multnomah County, respectively, indicating that Gillespie's listing 6 is zoned industrial and sale 2 is zoned commercial. (Ptfs' Rebuttal Exs 14 at 1, 15 at 3.)

The 2010-11 roll real market value of the subject property was $3,801,600. (Ptfs' Compl at 2.) The board of property tax appeals reduced the 2010-11 real market value of the subject property to $3,600,000. (*Id.*) The 2010-11 maximum assessed value of the subject property was $2,548,287. (*Id.*) Plaintiffs request a 2010-11 real market value of $1,132,097, which is the December 2010 purchase price less the value of personal property included in the sale. (*Id.* at 1.)

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2010-11 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No

020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[7]

The assessment date for the 2010-11 tax year was January 1, 2010. ORS 308.007; ORS 308.210.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). There are three approaches of valuation that must be considered, although all three approaches may not be applicable: the cost approach, the sales comparison approach, and the income approach. OAR 150-308.205-(A)(2)(a); *Allen v. Dept. of Rev.* (*Allen*), 17 OTR 248, 252 (2003).

Plaintiffs have the burden of proof and must establish their case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

Plaintiffs did not submit an appraisal report, relying instead on the December 2010 sale of the subject property. The lack of an appraisal is not fatal because "[t]he various approaches to valuation * * * are only the vehicles used to determine the ultimate fact – market value." *Kem v. Dept. of Rev.,* 267 Or 111, 114, 514 P2d 1335 (1973). "A recent sale of the property in question

---

[7] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

is important in determining its market value." *Id*. "If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sale price, while certainly not conclusive, is very persuasive of the market value." *Id*. Gillespie did not consider the December 2010 sale of the subject property to be a reliable indicator of value, characterizing it as a "liquidation" sale.

"This court has been reluctant to consider 'foreclosure' sales as 'arm's-length transactions' because such sales 'may well involve an element of compulsion on the part of the seller.' " *Voronaeff v. Crook County Assessor*, TC-MD No 110361C at 7 (Apr 25, 2012) (citations omitted). However, a foreclosure sale may be "a voluntary *bona fide* arm's-length transaction between a knowledgeable and willing buyer and a willing seller." *Ward v. Dept. of Revenue*, 293 Or 506, 508, 650 P2d 923 (1982). "There are narrow exceptions determined on a case-by-case basis to the holding that bank-owned property sales are not typically representative of real market value." *Brashnyk v. Lane County Assessor*, TC-MD No 110308 at 8, WL 6182028 *5 (Dec 12, 2011). "[W]here the majority of sales are distress, it would seem that that kind of sale would provide a more accurate reflection of the market." *Morrow Co. Grain Growers v. Dept. of Rev.*, 10 OTR 146, 148 (1985).

The court is not persuaded that the December 2010 sale of the subject property was an "accurate reflection of the market" as of January 1, 2010. The sale was not "recent" as of the January 1, 2010, assessment date. Dant testified that the market conditions in December 2010 were not materially different than those present on January 1, 2010, but did not provide any evidence supporting his testimony. Furthermore, the subject property sale in December 2010 was a bank-owned sale and Plaintiffs have not established by a preponderance of the evidence

///

that the December 2010 sale of the subject property for $1,132,097 (excluding personal property) was the real market value of the subject property as of January 1, 2010.

The better evidence of the subject property's 2010-11 real market value appears to be the July 2010 listing price of $3.6 million, which was also the 2010-11 real market value set by the board of property tax appeals. This court has observed that "bona fide listings establish the upper limit on the market value of the listed property." *Martin v. Dept. of Rev.*, 8 OTR 141, 147 (1979). The July 2010 listing of the subject property was closer in time to the January 1, 2010, assessment date and is a better reflection of the subject property's real market value as of that date. Dant testified that he initially listed the subject property for $3.6 million based on an appraisal report completed for Umpqua Bank, but subsequently agreed with Purdy's determination that the real market value of the subject property was $1.5 million. According to Dant, Purdy's letter estimated that necessary improvements following purchase would cost between $400,000 and $600,000. Purdy testified that, as of the date of trial, Willamalane had spent $885,000 on repairs and improvements to the subject property. Even accounting for the estimated cost of repairs and necessary improvements after sale, it is unclear why Dant considered the value of the subject property to be $1.5 million rather than $3 million, as Umpqua Bank counter-offered.

Gillespie presented evidence of the real market value of the subject property under the cost and sales comparison approaches, concluding a 2010-11 real market value of $5,500,000 based primarily on the sales comparison approach. She selected four sales and two listings of sports or athletic facilities. The comparable sales relied upon by Gillespie occurred well before the January 1, 2010, assessment date. Furthermore, none of her comparable sales or listings are located in the same zone as the subject property. It does not appear that Gillespie's real market

value conclusion for the subject property reflected the deed restrictions limiting the use of the subject property. Thus, the court finds Gillespie's value evidence unpersuasive.

As stated above, this "court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. The subject property is subject to numerous restrictions that contribute to the difficulty of determining its real market value. The court is not persuaded that the sale of the subject property for $1,132,097 (excluding personal property) in December 2010 is indicative of the real market value of the subject property as of January 1, 2010. The sales identified by Gillespie under the sales comparison approach are remote in time and location from the subject property and are not sufficiently similar to serve as reliable evidence of the January 1, 2010, real market value. The court finds that the 2010-11 real market value of the subject property was $3 million, based on the July 2010 listing price of $3.6 million less the estimated $400,000 to $600,000 cost of repairs and necessary improvements known to Dant and Purdy prior to the sale of the subject property.

For the court to order a change in real market value to the tax roll, Plaintiffs must be aggrieved. ORS 305.275(1)(a). To be aggrieved, the ordered change to the tax roll must result in a property tax reduction. The 2010-11 maximum assessed value of the subject property is $2,548,287, and the court did not receive evidence as to whether a reduction in the real market value to $3 million would result in tax savings to Plaintiffs.

### III. CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that the 2010-11 real market value of the subject property was $3 million. Now, therefore,

/ / /

IT IS THE DECISION OF THIS COURT that the 2010-11 real market value of property identified as Account 1699535 was $3 million. The tax roll will be adjusted only if Plaintiffs are aggrieved under ORS 305.275(1).

Dated this ___ day of August 2012.

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Allison R. Boomer on August 9, 2012. The Court filed and entered this document on August 9, 2012.*