IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

THOMAS KERR,                           )
                                       )
                 Plaintiff,            )    TC-MD 120315N
                                       )
        v.                             )
                                       )
MULTNOMAH COUNTY ASSESSOR,             )
                                       )
                 Defendant.            )    **DECISION**

Plaintiff appeals the real market value of property identified as Account R305362 for the

2011-12 tax year.  A telephone trial was held in this matter on December 11, 2012, and

December 13, 2012.  Steven Anderson (Anderson), an Oregon licensed real estate broker,

appeared on behalf of Plaintiff.  Jeff Brown appeared on behalf of Defendant.  Barry Dayton

(Dayton), Registered Appraiser 3, testified on behalf of Defendant.  Plaintiff's Exhibits 1 through

12 and Defendant's Exhibit A were received without objection.  The court excluded Plaintiff's

Rebuttal Exhibits 1 and 2 and Defendant's Rebuttal Exhibit B because the exhibits served no

rebuttal purpose and were not timely exchanged under Tax Court Rule-Magistrate Division 10 C.

## I.  STATEMENT OF FACTS

The subject property is a detached, single-family residence located in Gresham, Oregon.

(Ptf's Ex 1 at 3.)  The subject property has two bedrooms, one bathroom, a two-car garage, and a

wood-burning fireplace.  (*Id.*)  Defendant described the subject property improvement as:

> "[A] single level 'Shotgun' Bungalow style dwelling with unfinished basement,
> built around 1920.  Interior viewing proved items such as kitchen remodeled
> within the last fifteen years, bath remodeled within the last ten years, floor
> coverings updated, wood floors refinished, what used to be an enclosed porch
> converted to Gross Living Area (GLA) that also placed basement stairs into the
> GLA as well.  Windows are replaced.  Vinyl siding.  Roofing does show some
> discoloration.  Overall, the home is in above average condition."

(Def's Ex A at 4.) Plaintiff relied on a Regional Multiple Listing Service (RMLS) printout stating that the subject property improvement is 960 square-feet, whereas Defendant determined that the gross living area of the subject property is 1,058 square-feet. (Ptf's Ex 1 at 3; Def's Ex A at 10.) Dayton testified that the RMLS printout appears to be based on old title records for the subject property prior to the enclosure of the basement stairs. He testified that the gross living area increased when the basement stairs were enclosed. The subject property lot is located in the "Low Density Residential-5" zone; the subject property lot is 14,375 square-feet, although the "maximum site size" in that zone is 5,000 square-feet. (Def's Ex A at 4.)

The subject property was listed on July 23, 2009, for $180,000 "with disclosure of a short sale situation." (Def's Ex A at 5; Ptf's Ex 1 at 1.) The price was reduced in January 2010, February 2010, March 2010, June 2010, and August 2010. (Ptf's Ex 1-1.) Defendant reported that, on September 8, 2010, "a transfer by Trustee's Deed was delivered for the benefit of Mortgage Electronic Registration Systems, Inc. (MERS), showing default by the Grantor with following notice of default to sell and foreclose with consideration paid for the transfer of $135,000." (Def's Ex A at 5.) The subject property listing at $145,950 was cancelled on September 20, 2010. (Ptf's Ex 1 at 1.) It was relisted on November 4, 2010, at $149,900 and "disclosed as a bank owned sale * * *." (Def's Ex A at 5; Ptf's Ex 1 at 1.) The subject property listing price was reduced to $138,100 in December 2010, and reduced again in January and February 2011 before it sold for $108,000. (Ptf's Ex 1 at 1.) The sale was pending in March 2011 and closed May 2011. (*Id.*)

Anderson testified that he completed several "studies" of sales in Gresham using RMLS. (*See* Ptf's Exs 2-10.) He testified that he searched for all Gresham sales in the price range of $100,000 to $150,000 from January 1, 2010, through December 31, 2011. (Ptf's Ex 2 at 1.)

Anderson's search yielded 264 records, of which 133 were "bank owned" sales and 46 were "short sale[s]." (Ptf's Exs 2 at 1, 3 at 1, 4 at 1.) He performed the same search for the time periods of January 1, 2011, through December 31, 2011, and for May 1, 2011, through May 31, 2011. (Ptf's Exs 5-10.) Dayton testified that Anderson's limitation of his search to sales in the price range of $100,000 to $150,000 created a "self-fulfilling prophesy" with respect to the percentage of distressed sales in the results. Dayton noted that, because Anderson failed to limit his property search based on physical characteristics of the subject property, his search yielded condominiums, attached residences, and manufactured homes. (*See, e.g.,* Ptf's Ex 2 at 1.)

Dayton testified that he also analyzed the number of short and distressed sales in Gresham. (*See* Def's Ex A at 7.) He testified that he used only single family detached homes in Gresham and found a significant difference in price between distressed and non-distressed sales. (*Id.*) Dayton testified that short sales and bank sales typically sell for lower prices than non-distressed sales because banks have to approve offers and banks often impose numerous conditions and clauses that are bad for the buyer; for instance, earnest money is often non-refundable, properties are often sold as-is, and banks use their own sale contracts. He noted that the RMLS printout for the subject property indicates such conditions were present: "BOFA Loan Prequal req'd with financed offer * * * sold as-is * * * upcoming auction." (Ptf's Ex 1 at 3.)

Anderson provided a RMLS market action report for May 2011 demonstrating that prices were still falling in the Portland metropolitan area in 2011. (Ptf's Ex 12.) Dayton questioned the relevance of the RMLS Market Action report, noting that the "Portland metropolitan area" for RMLS includes many areas outside of Multnomah County, such as parts of Yamhill, Clackamas, Washington, and Columbia counties.

/ / /

Dayton testified that he identified five comparable sales, all of which were non-distressed sales located within 0.13 to 0.33 miles of the subject property. (Def's Ex A at 10-11.) His sales 4 and 5 "are of the same property as a sale and resale of two separate arms-length transactions[.]" (*Id.* at 8.) Dayton testified that his comparable sales bracketed the subject property with respect to age, condition, and gross living area. He considered sales 2 and 3 to be "most similar overall in regards to condition[.]" (*Id.*) The unadjusted sales prices of Dayton's comparable sales ranged from $145,000 to $181,000. (*Id.* at 10-11.) He made net adjustments ranging from -11.6 to +17.6 percent. (*Id.*) Dayton's adjusted prices ranged from $159,000 to $170,500 and he concluded a real market value of $163,000 for the subject property. (*Id.* at 9-11.)

The 2011-12 roll real market value of the subject property was $233,810. (Compl at 3.) The Board of Property Tax Appeals reduced the 2011-12 real market value to $169,910. (*Id.*) The 2011-12 maximum assessed value of the subject property was $141,500. (*Id.*)

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2011-12 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citations omitted)). Real market value is defined in ORS 308.205(1),[1] which states: "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year." The assessment date for the 2011-12 tax year was January 1, 2011. ORS 308.007; ORS 308.210.

---

[1] All references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2009.

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). There are three approaches of value that must be considered, although all three may not be applicable in a given case. OAR 150-308.205-(A)(2)(a). The three approaches are: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach. *Id.*

Plaintiff did not provide evidence under any of the three approaches of value, relying instead on the May 2011 sale of the subject property. The lack of an appraisal is not fatal because "[t]he various approaches to valuation * * * are only the vehicles used to determine the ultimate fact -- market value." *Kem v. Dept. of Rev.* (*Kem*)*,* 267 Or 111, 114, 514 P2d 1335 (1973). "A recent sale of the property in question is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." *Id*. "In the absence of data indicating that 'the price paid was out of line with other market data material, we believe [a recent sale] to be one of the best and most satisfactory standards for the estimation of actual value although, admittedly, it is not conclusive.' " *Ernst Bros. Corp. v. Dept. of Rev.*, 320 Or 294, 300, 882 P2d 591 (1994), *citing Equity Land Res. v. Dept. of Rev.*, 268 Or 410, 415, 521 P2d 324 (1974).

Defendant relied on the sales comparison approach. "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions." OAR 150-308.205-(A)(2)(c). "The court looks for arm's length sale transactions of property similar in size, quality, age and

location * * * in order to determine the real market value[]" of the subject property. *Richardson*, WL 21263620 at *3.

Plaintiff has the burden of proof and must establish his case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). Plaintiff "must provide competent evidence of the [real market value] of [his] property." *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D, WL 879285 (March 13, 2012). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

Relying on *Kem*, Anderson argued that the sale of the subject property is the best evidence of its real market value as of January 1, 2011. Anderson noted that the subject property was on the market for a total of 542 days. Dayton disagreed that the sale of the subject property is persuasive evidence, focusing on the fact that it was a bank sale following foreclosure.

Under *Kem*, a sale of the subject property must be "recent." 267 Or at 114. "Whether a transaction is so recent as to be persuasive of present value will depend upon the similarity of conditions affecting value at the time of the transaction and conditions affecting value at the time of the assessment." *Sabin v. Dept. of Rev.*, 270 Or 422, 426-27, 528 P2d 69 (1974). The sale of

the subject property was pending as of March 2011 and closed May 2011. Anderson provided a May 2011 RMLS market action report demonstrating that prices in the Portland metropolitan area were falling in 2011. As noted by Dayton, the relevance of that report is questionable given the large geographic area included. To the extent that weight is given to the report, it suggests that market conditions in May 2011 were somewhat inferior to conditions in January 2011.[2] Based solely upon the change in market conditions, the May 2011 sale of the subject property for $108,000 was likely less than its real market value as of January 1, 2011.

A sale of the subject property must also be a "voluntary, arm's length transaction * * *." *Kem*, 267 Or at 114. The May 2011 sale of the subject property was a bank sale following foreclosure. "This court has been reluctant to consider 'foreclosure' sales as 'arm's-length transactions' because such sales 'may well involve an element of compulsion on the part of the seller.' " *Voronaeff v. Crook County Assessor*, TC-MD No 110361C at 7 (Apr 25, 2012) (citations omitted). "[T]he lender may have a policy of selling such property only for the amount of the underlying debt, regardless of what the property may actually be worth, particularly if it would take a few months more to find a buyer willing to pay a higher price." *Kryl v. Lane County Assessor*, TC-MD No 100192B, WL 1197444 at *2 (Mar 30, 2011). Property purchased through foreclosure may be "a voluntary *bona fide* arm's-length transaction between a knowledgeable and willing buyer and a willing seller." *Ward v. Dept. of Rev.* (*Ward*), 293 Or 506, 508, 650 P2d 923 (1982). "There are narrow exceptions determined on a case-by-case basis to the holding that bank-owned property sales are not typically representative of real market value." *Brashnyk v. Lane County Assessor* (*Brashnyk*), TC-MD No 110308 at 8, WL 6182028 *5 (Dec 12, 2011).

---

[2] The May 2011 RMLS market action report states: "Average sale prices for May 2011 declined 4.8% compared to May 2010. Median sale prices also fell 7.9%." (Ptf's Ex 12 at 1.)

"[W]here the majority of sales are distress, it would seem that that kind of sale would provide a more accurate reflection of the market." *Morrow Co. Grain Growers v. Dept. of Rev.*, 10 OTR 146, 148 (1985). Anderson provided several studies of Gresham sales purporting to show that the majority of sales in Gresham close to the January 1, 2011, assessment date were "bank owned" sales or "short sales." As noted by Dayton, Anderson's studies suffered from several flaws. First, the studies were not limited by property type or other characteristics that would limit sales included in the studies to properties comparable to the subject property. To the extent that the studies focused on properties in different markets than the subject property, the studies are unpersuasive. Second, Anderson limited his studies to sales in the price range of $100,000 to $150,000. Given that the ultimate issue in this appeal is the real market value of the subject property as of January 1, 2011, it is unclear why Anderson limited his study to sales of properties in a set price range. Anderson's studies are unpersuasive insofar as they are premised on the assumption that the real market value of the subject property as of January 1, 2011, was in between $100,000 and $150,000. Furthermore, it is unsurprising that many sales at low end of the price range are distress sales. As Dayton noted, Anderson created a "self-fulfilling prophesy" by limiting his studies to sales at the low end of the price range.

If a property has been marketed for a sufficiently long period of time and properly exposed to the market, the implication of distress on the part of the seller may be removed and a bank sale may be found to be arm's-length. *Ward*, 293 Or at 508; *see Brashnyk*, WL 6182028 at *6 (a five year listing period, including four years prior to the bank's acquisition, was persuasive evidence that the bank sale reflected market value). This court has observed that "bona fide listings establish the upper limit on the market value of the listed property." *Martin v. Dept. of Rev.*, 8 OTR 141, 147 (1979); *see Metzger v. Clatsop County Assessor*, TC-MD No 120534D at

8 (Oct 30, 2012) (finding that the real market value of the subject property was "no more than *
* * the subject property's final listing price, a price set close to the assessment date").

Prior to foreclosure in September 2010, the subject property was listed beginning July 2009 for $180,000 and continuously listed thereafter until September 2010.  The final listing price as of September 20, 2010, was $145,950.  Following foreclosure, the subject property was re-listed for $149,900 in November 2010.  The lengthy listing history of the subject property prior to foreclosure suggests that the real market value of the subject property as of January 1, 2011, was no more than $145,900.

Dayton relied on the sales comparison approach and concluded that the real market value of the subject property as of January 1, 2011, was $163,000.  His adjusted sale prices ranged from $159,000 to $170,500.  Plaintiff offered no competent evidence in rebuttal of Dayton's sales comparison approach.  It is difficult to reconcile the listing history of the subject property with Dayton's sales comparison approach, other than to observe that value "is a range * * * rather than an absolute." *Price v. Dept. of Rev*., 7 OTR 18, 25 (1977).  Ultimately, the court finds that the listing of the subject property from July 2009 through September 2010 provides the most persuasive evidence of real market value as of January 1, 2011.  The court concludes that the 2011-12 real market value of the subject property was $145,950.

The court's 2011-12 real market value conclusion of $145,950 exceeds the 2011-12 maximum assessed value of the subject property, $141,500.  For the court to order a change to the tax roll, Plaintiff must be aggrieved.  ORS 305.275(1)(a).  To be aggrieved, the ordered change to the tax roll must result in a property tax reduction.  The court did not receive evidence as to whether a reduction in the real market value of the subject property to $145,950 would result in tax savings to Plaintiff.  The court will not order a change unless Plaintiff is aggrieved.

### III.  CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that the 2011-12 real market value of the subject property was $145,950.  The court will not order a change to the tax roll unless Plaintiff is aggrieved.  Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of property identified as Account R305362 was $145,950 for the 2011-12 tax year.  The tax roll will be adjusted only if Plaintiff is aggrieved under ORS 305.275.

Dated this ____ day of February 2013.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Magistrate Allison R. Boomer on February 21, 2013.  The Court filed and entered this Decision on February 21, 2013.*